765 A.2d 79

**Larry DORSEY, Individually, et al.**

v.

**Jeffrey NOLD, D.O., et al.**

**No. 27, Sept. Term, 2000.**

Court of Appeals of Maryland.

Jan. 8, 2001.

Matt R. Ballenger (T. Christine Pham of Suder & Suder, P.A., on brief), Baltimore, for petitioners.

Roy L. Mason (Kristin L. Kremer of Mason, Ketterman & Cawood, P.A., on brief), Annapolis, for respondents.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY *,
RAKER, WILNER, CATHELL, and HARRELL, JJ.

WILNER, Judge.

This is a medical malpractice action arising out of the tragic
death of 16–year–old Candace Dorsey. Believing that Can-
dace's death was precipitated by a cancerous thyroid tumor
that pressed on her trachea and constricted her breathing,
Candace's parents and her estate sued respondent, Jeffrey
Nold, a pediatrician who had examined Candace three days
before her death, claiming that Dr. Nold was negligent in
failing to diagnose the cancer, recognize the danger that it
posed, and take remedial action. A jury in the Circuit Court
for Anne Arundel County concluded that Dr. Nold did not
breach the applicable standard of care in his treatment of
Candace.[1] From the judgment entered on that verdict, peti-
tioners appealed, complaining about three evidentiary rulings
made by the trial court. The Court of Special Appeals
affirmed the judgment, *Dorsey v. Nold*, 130 Md.App. 237, 745
A.2d 1119 (2000), and we granted *certiorari* to review further
those three complaints. We shall reverse.

## BACKGROUND

In early December, 1993, Candace, who, though obese,
appeared to be in good health, developed an unusual and
persistent cough from deep in the chest, a cough that did not
bring up any phlegm. On Saturday, December 11, her mother
took her to the Anne Arundel County Pediatric Center, where
she was examined by Dr. Nold. Candace was breathing nor-
mally, without difficulty, and, despite the coughing that led to
the visit, neither she nor her mother reported any breathing

---

* Rodowsky, J., now retired, participated in the hearing and conference of
this case while an active member of this Court; after being recalled
pursuant to the Constitution, Article IV, Section 3A, he also participated
in the decision and adoption of this opinion.

1. Petitioners also sued the Anne Arundel Medical Center and three
other physicians who worked at the Center. Those actions were dis-
missed during the litigation and are no longer before us.

or coughing problem. Dr. Nold did notice, however, a large thyroid goiter of approximately six centimeters, which was firm and nontender and which Candace said that she had for several years. In light of Candace's obesity, Dr. Nold thought that the goiter was likely the product of hypothyroidism. When a rapid strep test proved negative, Dr. Nold concluded that she had an upper respiratory infection—a cold—and a viral sore throat. He authorized a thyroid function test to check for hypothyroidism but prescribed no medication and took no other action.

Candace returned to her normal activities for the next two days. After school on Monday, December 13, her mother took her to have the thyroid test and, because she seemed sluggish, decided to keep her home from school the next day and take her back to the doctor. Around 2:00 a.m. on the morning of December 14, Candace's mother heard what sounded like hard breathing and found Candace on the floor of her room breathing so hard that she could not speak. Paramedics were called. When they arrived, they administered oxygen and tried to question Candace, but because of her labored breathing she was unable to answer. At that point, they decided to take her to the hospital and placed her in the ambulance. With assistance, she was able to walk out of the house and get on to the stretcher. On the trip to the hospital, however, Candace went into cardiac arrest, and despite everyone's best efforts in the ambulance and later at the hospital, she could not be revived. She was pronounced dead at 3:45 a.m., December 14.

The emergency room physician who treated Candace upon her arrival at the hospital concluded that Candace died of respiratory arrest but was unable to determine the cause of that arrest—why, exactly, Candace was unable to breathe—and she therefore recommended that the case be referred to the medical examiner. Dr. Theodore King, an assistant medical examiner, performed an autopsy later on December 14. In his autopsy report, he observed that Candace's upper airway was compressed and narrowed by "an extrinsic process." Specifically, he noted two discreet masses in front of the trachea, just beneath the thyroid gland. Dr. King concluded

that Candace died "of asphyxia (choking) secondary to airway compression." He added that "the airway compression was caused by an infiltrating carcinoma of the thyroid which arose in the neck of the deceased and compressed her airway." Dr. King mentioned no other cause and said nothing, one way or the other, as to whether Candace suffered from asthma.

Petitioners filed this lawsuit in July, 1996, claiming, as we said, that Dr. Nold was negligent in failing (1) to diagnose the cancer of the thyroid, (2) to diagnose and appreciate a significant tracheal obstruction, (3) to order appropriate tests, which would have shown a significant airway obstruction, and (4) to refer Candace to a specialist. In September, 1997, an amended scheduling order was entered pursuant to Maryland Rule 2–504. The order set trial for June 16, 1998 and directed that all discovery procedures be completed by April 30, 1998. It required that petitioners furnish to respondent, by October 20, 1997, "the names and addresses of all expert witnesses and such other information regarding expert witnesses as is required by [Maryland Rule 2–402(e)(1)]" and that respondent furnish similar information to petitioners by January 1, 1998. The order warned that failure to comply with its mandates "will or may lead to sanctions of one or more of the parties or their counsel including dismissal or default where applicable."

On October 20, 1997, petitioners served on respondent their designation of expert witnesses, naming only Dr. William Brownley and Dr. Barry Singer. The only information given with respect to their expected testimony was that they would testify "regarding the allegations contained in the Complaint and that the Defendants breached acceptable standards of care in the care and treatment of [Candace] and that these breaches caused injuries and damages to Plaintiffs, as set forth in the Complaint." The response also stated that petitioners reserved the right to call "any and/or all treating health care providers, and/or other persons involved with the care and treatment of Candace Dorsey" and "to name rebuttal experts after the completion of the depositions of Defendants' experts."

On December 30, 1997, respondent named his four expert witnesses—Drs. DeVore, Tunkel, Fink, and Hutchins—although he did not indicate the nature of their expected testimony. On April 20, petitioners filed a notice to take the depositions of those four experts, and on May 12, they sent their answers to respondent's interrogatories.

Petitioners took the deposition of Dr. Hutchins on May 4, 1998 and, for the first time, were apprised of his opinion that the cause of Candace's death was not a cancerous thyroid tumor pressing on the trachea, as Dr. King believed, but rather an asthma attack. On June 10—five weeks later and only six days before trial was scheduled to begin, petitioners informed respondent that, "in light of the deposition testimony of Dr. Grover Hutchins," they "may" call Dr. King to testify at trial. The letter, which is not in the record, apparently did not indicate the nature of Dr. King's possible testimony. Inferring that Dr. King would be called as an expert witness, respondent moved, *in limine*, to preclude his testimony, noting that, until June 10, Dr. King had not been identified as an expert witness, that he had not been deposed, and that "his opinions, whatever they are, [had not] been provided to the defense for review and evaluation." Respondent complained that he would be prejudiced if Dr. King was allowed to testify. Accompanying that motion was another one to preclude petitioners from offering evidence that respondent, who currently was a board-certified pediatrician, did not pass the board examination on his first try, urging that such evidence would be both irrelevant and prejudicial.

The court took up these motions on the first day of trial and, after hearing argument, granted both of them. Noting that many lawyers, including top law school graduates, do not pass the Bar Examination on the first try, the court held that evidence regarding Dr. Nold's unsuccessful first attempt at the board examination had little probative value with respect to whether he violated the applicable standard of care and would not be admitted. With respect to Dr. King, petitioners' counsel claimed that, until he took Dr. Hutchins's deposition on May 4, he was unaware that respondent intended to claim

that Dr. King's conclusion was wrong and that asthma would be asserted as the effective cause of Candace's death. He also contested the assertion that respondent was unaware of Dr. King's opinion, noting that respondent had a copy of the autopsy report and that defense counsel had, in fact, spoken with Dr. King. In that regard, he asserted that Dr. King "is being called to testify concerning his autopsy report" and that "*I am not calling him to offer anything else other than what is contained in his autopsy report.*" (Emphasis added). He further argued that Dr. King was not even an expert witness, but rather was a fact witness. Defense counsel responded that he had no objection to the autopsy report but suggested that King's testimony would go beyond that, to "counter the argument of a Defense expert."

The court clearly treated Dr. King as an expert, not a fact, witness and concluded that it would be unfair to allow him to testify. The court found no merit in counsel's assertion that he was surprised by Dr. Hutchins's conclusions and suggested that it should have been obvious that respondent would not agree with Dr. King's findings. To permit his testimony, the court found, would require a postponement to allow respondent to take his deposition and possibly to search for additional experts to counter his opinion: "[i]t is prejudicial to the defense in that at the last moment, they are confronted with a witness they have not had the opportunity to depose and with no experts to counter whatever his testimony might be."

The autopsy report was admitted into evidence as an exhibit and, through it, the jury was informed of Dr. King's conclusion as to the cause of Candace's inability to breathe. Petitioners added to that the expert testimony of Drs. Singer and Brownley, both of whom opined that Dr. Nold violated the applicable standard of care in not appreciating and acting upon the danger posed by the thyroid growth, in light of the fact that Candace also had a cold. The essence of their testimony was not that the cancer would grow precipitously but that the goiter, as it existed, would constrict Candace's breathing and that the constriction could become dangerous when coupled with her upper respiratory infection. Dr. Singer testified that

the standard of care mandated that Dr. Nold evaluate the growth that he found to see if it was causing an occlusion of the respiratory track, which in turn required an immediate CT scan to show if the mass was impinging the trachea and causing respiratory problems. Dr. Brownley stated that recognition of an upper respiratory infection in a patient with a sizeable neck mass warranted immediate attention, which, in his view, meant referral to a surgeon. Both of those opinions rested, at least tacitly, on the assumption that Candace died as the result of the thyroid tumor pressing on the trachea and thereby restricting her ability to breathe.

Respondent countered with the testimony of three of his experts. Dr. Hutchins, a pathologist, opined that Candace died of an acute attack of asthma and not from a compression of the trachea caused by the thyroid tumor. That opinion was based on a number of things, including his analysis of tissue slides made in connection with the autopsy. Essentially, he concluded that the tumor displaced softer tissue surrounding it and may have moved the trachea but did not invade or compress it. On cross-examination, he stated directly that a review of the histology—the tissue slides—did not support Dr. King's contention that the upper airway was narrowed by the tumor. In that regard, he said that he saw creola cells on one of the high—magnification slides, which was another indication of asthma. Dr. Tunkel, a pediatric otolaryngologist, also testified that Dr. Nold met the standard of care in evaluating and treating Candace—that it was appropriate for him to refer her for a thyroid function test before resorting to either a CT scan or surgery. Although, in contrast to the view of Dr. Hutchins, Dr. Tunkel believed that Candace did have some compression of the trachea when she saw Dr. Nold, he felt it appropriate to proceed as Dr. Nold did. He too stated that the tumor would more likely move the semi-rigid trachea rather than restrict the breathing.

Dr. Fink, a board-certified pediatrician who practices pulmonary medicine, further confirmed that Dr. Nold practiced entirely within the standard of care, noting that there were no symptoms of airway compression at the time of Candace's visit

and that hypothyroidism is not an emergency situation that required hospitalization. Dr. Fink agreed with Dr. Hutchins that Candace died of an acute asthma attack and that both her history and the anatomical observations of the trachea itself were inconsistent with death from a tracheal obstruction. On cross-examination, he noted Dr. King's conclusion that the tracheal sections were normal and pointed out that if an extrinsic mass were narrowing the trachea to the extent claimed, the cartilage would become "markedly distorted," and that condition would be observable under a microscope.

Following this testimony, which concluded the defendant's case, petitioners sought to call Dr. King as a rebuttal witness. Respondent objected on the ground that, if Dr. King was merely to confirm the conclusions he stated in his autopsy report, the testimony would not rebut anything new injected by the defense and would not, therefore, be proper rebuttal. Petitioners suggested that Dr. King would be able to rebut Dr. Hutchins's testimony regarding the presence of creola cells on the tissue slides of the trachea and would testify that he saw no such cells on those slides. The court disallowed the rebuttal testimony, in part because to do otherwise would be inconsistent with the sanction applied for the discovery violation, and in part because the testimony would not add anything new.

In the Court of Special Appeals, petitioners argued that the trial court abused its discretion in (1) not allowing Dr. King to testify in their case-in-chief, (2) not allowing him to testify as a rebuttal witness, and (3) not allowing evidence that Dr. Nold failed his board examination on the first try. That court found no abuse of discretion in any of those rulings and affirmed the judgment entered in favor of Dr. Nold.

## DISCUSSION

### *Failure To Pass Board Examination*

■ We shall deal first with the third issue raised by petitioners. Dr. Nold graduated with a degree in osteopathic medicine in 1989. He did a one-year rotating internship,

followed by a three-year residency in pediatrics, which he completed in June, 1993. He became board-certified in pediatrics in 1994. When he saw Candace in December, 1993, he was five-and-a-half months out of training and not yet board-certified. In accordance with standard procedure, his hospital privileges during that first year of practice were probationary. All of that information was presented to the jury. Petitioners wanted to add evidence that Dr. Nold did not pass the board examination when he took it the first time. Respondent asserted, in response, that "[h]e was ill, and did not pass it. And then when he took it the second time, he did pass it." Noting that he would not be testifying as an expert witness regarding the standard of care, respondent moved *in limine* to exclude that evidence. As noted, the court granted the motion upon a finding that the proffered evidence would have "little probative value."

■ We find no error in that ruling. Although a physician's failure to pass a board certification examination has been held admissible when the physician testifies as an expert, as being relevant to his or her qualifications as an expert, *see Ward v. Epting,* 290 S.C. 547, 351 S.E.2d 867, 872 (Ct.App. 1986); *McCray v. Shams,* 224 Ill.App.3d 999, 167 Ill.Dec. 184, 587 N.E.2d 66, 69–70, *appeal denied,* 145 Ill.2d 635, 173 Ill.Dec. 6, 596 N.E.2d 630 (1992), the general rule is that "a physician's inability to pass a medical board certification exam has little, if any, relevance to the issue of whether the physician complied with the standard of care required in his or her treatment of a patient." *Gipson v. Younes,* 724 So.2d 530, 531–32 (Ala.Civ.App.1998). *See also Campbell v. Vinjamuri,* 19 F.3d 1274, 1276–77 (8th Cir.1994); *Douglas v. University Hosp.,* 150 F.R.D. 165, 171 (E.D.Mo.1993); *Jackson v. Buchman,* 338 Ark. 467, 996 S.W.2d 30, 34 (1999); *Williams v. Memorial Medical Center,* 218 Ga.App. 107, 460 S.E.2d 558, 560 (1995); *Beis v. Dias,* 859 S.W.2d 835, 838–39 (Mo.Ct.App. 1993). We agree with that view. There could be many reasons why a physician failed all or part of a board certification examination; the fact of failure makes it neither more nor less probable that the physician complied with or departed

from the applicable standard of care in the diagnosis or treatment of a particular patient for a particular condition.

Dr. Nold did not testify as an expert in this case. His testimony was limited to a recitation of what he observed and what he did on the occasion of Candace's visit. He did not opine with respect to the standard of care, and the fact that he failed the board examination on his first try had little or no probative value with respect to whether his conduct was negligent.

### Exclusion of Dr. King in Case–In–Chief

Dr. King was excluded as a witness on the ground that he would be testifying as an expert, that petitioners' intent to call him as an expert was not disclosed to respondent in conformance with the scheduling order, and that allowance of his expert testimony, in light of the late disclosure and respondent's inability to depose the witness, would prejudice respondent. Petitioners urge that the court erred in so ruling, in that (1) Dr. King was not an expert witness whose identity needed to be disclosed in discovery, (2) there was, therefore, no violation of the discovery rules or of the scheduling order, and (3) in any event, there was no prejudice to respondent, who, having received a copy of the autopsy report and having actually spoken with Dr. King about the report, was fully aware of Dr. King's opinion and findings.

In examining these issues, we begin by laying out the broad discovery framework and distinguishing between the substantive requirements of the discovery rules and the timing requirements of a scheduling order entered pursuant to Rule 2–504. As an introduction, it is important to note that parties in litigation are not limited in their gathering of information to formal discovery procedures but may make any lawful investigations they choose. They may, on their own, search for and obtain documents, witness statements, and all other kinds of evidence. Thus, respondent did not, as a legal matter, need to invoke any formal discovery process in order to learn about Dr. King, to obtain a copy of his autopsy report, or to interview him and question him about his findings. Indeed,

without invoking formal discovery, they did all of those things early in the litigation.

The formal discovery process applicable in the circuit courts is set forth in Title 2, Chapter 400, of the Maryland Rules. It is a compulsory one in that it requires parties to disclose certain relevant information that they may not be willing to disclose voluntarily. The compulsion lies in the fact that failure to make adequate disclosure upon a proper request can result in a range of sanctions, including an order that precludes the party from using the information that should have been disclosed. *See* Rule 2-433.

■ Maryland Rule 2-402(a), dealing with the scope of discovery, provides that a party may obtain discovery regarding any matter not privileged, including "the identity and location of persons having knowledge of any discoverable matter, if the matter sought is relevant to the subject matter involved in the action." That is a very broad provision, the intent being to eliminate, as far as possible, a party going to trial in a confused state concerning the facts that gave rise to the litigation. *Baltimore Transit v. Mezzanotti,* 227 Md. 8, 13, 174 A.2d 768, 771 (1961); *Kelch v. Mass Transit Adm.,* 287 Md. 223, 229, 411 A.2d 449, 454 (1980). It includes information that may already be known to or otherwise obtainable by the requesting party. Discovery may take the form of interrogatories, depositions, demands for the production of documents or other tangible things, inspection of land or other property, mental or physical examinations, and requests for the admission of facts and genuineness of documents. Rule 2-401(a). There is no hierarchy among these various methods. If the party learns the identity of a witness or the existence of a document in some other manner, there is no compulsion to file interrogatories before proceeding with a deposition or demand for production.

Sections (c), (d), and (e) of Rule 2-402 put some limits on the scope of compulsory discovery. Section (c) begins by creating an initial shield around certain work product material that otherwise would be freely discoverable under § (a). Subject to §§ (d) and (e) of the rule, it permits discovery of

documents or other tangible things "prepared in anticipation of litigation or for trial" *only* upon a showing that (1) the material sought is otherwise discoverable, *and* (2) the party seeking discovery "has substantial need for the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Even upon that showing, § (c) requires that the court "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Under that provision, standing alone, the opinion of an expert witness that was prepared in anticipation of litigation or for trial would ordinarily not be discoverable.

Sections (d) and (e) provide exceptions to the limitations of § (c), however, and allow parties to obtain certain documents or information otherwise within the constraints of § (c) without having to make the showing required by that section. Section (e) deals with experts—those expected to be called to testify at trial and those not expected to be so called. With respect to the second category—an expert retained by a party in anticipation of litigation or for trial but *not* expected to be called as a witness at trial— § (e)(2) provides that discovery of the identity, findings, and opinions of the expert may be obtained *only* if a showing of the kind required by § (c) is made. Thus, absent a court order to the contrary, a party is not required to disclose the identity or opinion of an expert whom the party consults or retains for purposes of the litigation but, for whatever reason, chooses not to call as a witness. *Compare* Maryland Rule 12–206(b), allowing discovery of such expert witnesses and their opinions in condemnation cases.

Section (e)(1), dealing with experts intended to be called as witnesses, provides that discovery of the findings and opinions of such experts, otherwise discoverable and "acquired or developed in anticipation of litigation or for trial" may be obtained without the showing required under § (c), but only as set forth in § (e)(1)(A) and (B). Section (e)(1)(A) states that, by interrogatory, a party may require another party "to identify each person whom the other party expects to call as

an expert witness at trial, to state the subject matter on which the expert is expected to testify, to state the substance of the findings and the opinions to which the expert is expected to testify and a summary of the grounds for each opinion, and to produce any written report made by the expert concerning those findings and opinions." Under § (e)(1)(B), a party "may obtain further discovery, by deposition or otherwise, of the findings and opinions to which an expert is expected to testify at trial, including any written reports made by the expert concerning those findings and opinions."

When all of these provisions are read together, the following emerges. Subject to any professional ethical constraints on either the lawyer or the expert, a party is permitted, through his or her own investigations independent of the formal discovery process, to discover the identity and opinion of any expert any other party has consulted, whether or not the party intends to call that expert. If a party chooses to invoke the formal discovery procedure set forth in the Title 2, Chapter 400 rules, the party may not force disclosure of the findings or opinions of experts who are retained by another party in anticipation of litigation or for trial but who are not expected to be called to testify, without making the kind of showing required by Rule 2–402(c). A party *is* entitled to disclosure, however, without complying with § (c), of experts retained in anticipation of litigation or for trial who *are* expected to be called to testify. If, upon proper request, the party retaining such an expert fails to disclose the required information, the party is subject to the range of sanctions allowed under Rule 2–433 for discovery violations.

One distinction between experts and non-experts is that, although a party is entitled under Rule 2–402(e)(1) to disclosure of the identity of experts that another party intends to call to testify—*i.e.,* to know specifically whom the party intends to call as expert witnesses—a party is not ordinarily entitled, under current Maryland practice, to the same information with respect to lay witnesses. Rule 2–402(a) requires the disclosure, upon proper request, of persons having knowledge of discoverable matter, which, as a practical matter, will

include persons whom a party intends to call as witnesses, but it does not require the party to separately disclose his or her list of potential non-expert witnesses.[2]

■ Rule 2–504, dealing with pre-trial scheduling orders, impacts on the discovery process but does not directly expand or restrict the scope of it. With certain exceptions, it requires the circuit courts to enter a scheduling order in every civil action and sets forth provisions that either must or may be included in such an order. The principal function of a scheduling order is to move the case efficiently through the litigation process by setting specific dates or time limits for anticipated litigation events to occur. *See Tobin v. Marriott Hotels*, 111 Md.App. 566, 572–73, 683 A.2d 784, 787 (1996). To that end, Rule 2–504(b)(1) *requires* a scheduling order to contain "one or more dates by which each party shall identify each person whom the party expects to call as an expert witness at trial, including all information specified in Rule 2–402(e)(1)(A)" as well as "a date by which all discovery must be completed." Rule 2–504(b)(1)(B), (D).[3]

**2.** Prior to the 1993 amendments to Fed.R.Civ.Proc. 26, that was the predominant view in Federal litigation as well. *See* 8 Wright, Miller & Marcus, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 2013: "A distinction has traditionally been drawn between witnesses to the events in question and witnesses who will be called for trial by the adverse party. The names of occurrence witnesses could always be obtained by discovery. It was generally held, however, that a party was not entitled to find out, by discovery, which witnesses its opponent intended to call at the trial, although there was some authority to the contrary." *See Wirtz v. Continental Finance & Loan Co. of West End*, 326 F.2d 561, 564 (5th Cir.1964); *Wirtz v. B.A.C. Steel Products, Inc.*, 312 F.2d 14, 16 (4th Cir.1962); *Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 356 (3d Cir. 1998); *Buining v. The Transporter*, 171 F.Supp. 127, 132 (D.Md.1959); *Coca Cola Co. v. Dixi–Cola Laboratories*, 30 F.Supp. 275, 280 (D.Md. 1939). Under current Rule 26(a)(3), which, as amended in 1993, added provisions requiring the disclosure of certain core information even without request, parties must disclose, in accordance with any scheduling order or, if none, at least 30 days before trial, the identity of each witness the party intends to present in its case-in-chief. Maryland does not presently have a comparable provision.

**3.** Rule 2–504(b)(2)(A) *permits* a scheduling order to contain "any limitations on discovery otherwise permitted under these rules, including

Rule 2–504 is not a discovery rule. It is not included in the Title 2, Chapter 400 rules on discovery and, except as provided in § (b)(2)(A), is not intended either to enlarge or constrict the scope of discovery. Its function, to the extent it references discovery in § (b)(1), is to provide for the setting of time limits on certain discovery events; it is, in that regard, a rule of timing, not of substance. Thus, the experts required to be identified within the time set in a scheduling order entered pursuant to Rule 2–504(b)(1)(B) are those experts required to be identified under Rule 2–402(e), and what must be disclosed within the stated time limit is the information required to be disclosed by Rule 2–402(e)(1)(A)—the identity of the witness, the subject matter on which the witness is expected to testify, a summary of the grounds of the expert's opinion, and a copy of any written report made by the expert concerning that opinion. By referencing only § (e)(1)(A) of Rule 2–402, Rule 2–504(b)(1)(B) anticipates that the party receiving that information by the date set by the scheduling order will have some additional time in which to pursue the further discovery allowed under Rule 2–402(e)(1)(B)—ordinarily a deposition of the witness. The date for the completion of that phase is the date specified in the scheduling order pursuant to Rule 2–504(b)(1)(D)—the completion of all discovery.

Just as there are sanctions for the violation of the discovery rules, sanctions are available for the violation of directives in scheduling orders, although they are not specified in any rule. *See Manzano v. Southern Md. Hospital,* 347 Md. 17, 29, 698 A.2d 531, 536 (1997). The offense justifying such a sanction is not just the non-disclosure itself, but the non-disclosure within the time set by the court for disclosure to occur. Apart from any actual prejudice that may be suffered by the party in not receiving the information in a timely fashion, or that may be suffered by the court if trial has to be

reasonable limitations on the number of interrogatories, depositions, and other forms of discovery." A scheduling order containing such a provision may well restrict the scope of discovery, but we are not dealing with a provision of that kind in this case.

postponed, the court is demeaned by noncompliance with its order. *See Betz v. State*, 99 Md.App. 60, 635 A.2d 77 (1994).

Six days before trial, petitioners decided that they "may" wish to call Dr. King as a witness, and, on the morning of trial, they made clear that they *did* wish to call him. In determining whether there was any violation of either the discovery rules or the scheduling order, it therefore becomes important to determine whether Dr. King was an expert witness whose identity (1) was sought by interrogatory pro-pounded pursuant to Rule 2–421, and (2) was required to be disclosed under Rule 2–402(e)(1)(A). We may only infer the answer to the first part, as respondent's interrogatories are not in the record.[4] As petitioners do not suggest otherwise, however, we shall assume that respondent did, in fact, seek the identity of experts intended to be called as witnesses. The question, then, is whether Dr. King was an "expert" whose findings or opinion were "acquired or developed in anticipation of litigation or for trial." That is a two-part question: was he an expert and were his findings acquired in anticipation of litigation or for trial?

Petitioners' entreaties to the contrary notwithstanding, Dr. King would clearly have been an expert, not a fact witness. The essence of his testimony would have been an opinion on the *medical* cause of death, which, at least when not obvious to the average layman, is quintessentially a subject for expert opinion. *See Harasimowicz v. McAllister*, 78 F.R.D. 319 (E.D.Pa.1978); *Carroll v. Morgan*, 17 F.3d 787 (5th Cir.), *reh'g denied*, 26 F.3d 1117 (1994); *Miller v. Brass Rail Tavern, Inc.*, 541 Pa. 474, 664 A.2d 525, 527–28 (1995) (opinion of coroner relating to cause and time of death constitutes expert opinion); and *cf. Sippio v. State*, 350 Md. 633, 714 A.2d 864 (1998); *Langenfelder v. Thompson*, 179 Md. 502, 505–06, 20 A.2d 491, 493 (1941) (where injury or disease is of such a

---

4. Since 1991, "discovery material," which includes interrogatories and answers thereto, is no longer routinely filed with the court, although it may be used as an exhibit to support or oppose a motion. *See* Rule 2–401(d)(2).

character as to require a person skilled in the science or practice of medicine to determine its cause, medical expert may testify to his opinion thereof based on his scientific knowledge and skill and upon personal observation or scientific deductions from given facts).

The question, then, is whether the opinion or findings he would be asked to recite were developed or acquired in anticipation of the litigation or for trial, and the answer to that lies, ultimately, in what Dr. King was going to be asked on direct examination. As noted, in response to the motion *in limine*, petitioners represented that Dr. King would be called "to testify concerning his autopsy report" and that they were "not calling him to offer anything else other than what is contained in his autopsy report." In arguing their point to the Court of Special Appeals, they indicated that Dr. King would have been able to "explain, clarify and expand on the information written in the autopsy report" and to testify that the autopsy evidence did not support the defense that Candace died of an asthma attack. Regarding that statement as an expansion of the opinion expressed in the autopsy report, the intermediate appellate court concluded that, to the extent Dr. King wandered beyond the text of the autopsy report, his opinion would "more likely so than not" have been acquired or developed in anticipation of litigation or for trial, and, on that basis, it held that he was an expert whose identity had to be disclosed under Rule 2–402(e)(1).

The Court of Special Appeals, we think, gave greater significance to petitioners' appellate statements than is warranted. Dr. King was quite specific in his autopsy report conclusion: Candace died of asphyxia secondary to airway compression, and that airway compression "was caused by an infiltrating carcinoma of the thyroid which arose in the neck of the deceased and compressed her airway." That conclusion necessarily rules out an asthma attack as the cause of death, just as it does a gunshot wound, heart disease, and leukemia. If an expert opines that the available evidence leads solely to Conclusion X, it is at least implicit in that opinion that the evidence does not permit Conclusion Y, if Conclusion Y is

inconsistent with Conclusion X. *See Sippio v. State, supra,* 350 Md. at 651, 714 A.2d at 873 (medical examiner's conclusion that death was homicide allowed rejection of notion that it was accidental). Petitioners would thus not have been straying from the findings made in the autopsy report to have inquired whether evidence existed that indicated some other cause of death and, if so, why such evidence was not found persuasive. An expert does not necessarily create new opinions, developed or acquired in anticipation of litigation or for trial, simply by defending conclusions developed earlier for some other purpose, even if that defense takes the form of discrediting posited contrary conclusions.[5]

It is evident, therefore, that Dr. King was intended to be called, as an expert, simply to explain and elucidate the opinion he rendered in his autopsy report. In that circumstance, even if asked to discredit Dr. Hutchins's contrary view, he was not an expert whose opinion was acquired or developed in anticipation of litigation. The conclusion he reached as to the cause of Candace's death came not in anticipation of any litigation or to prepare for trial but from his duty as a medical examiner under Maryland Code, §§ 5–309 to 5–311 of the Health–General Article to investigate and determine the cause of Candace's death and to make an official report of his findings. *See Harasimowicz v. McAllister, supra,* 78 F.R.D. at 320 and *Miller v. Brass Rail Tavern, Inc., supra,* 664 A.2d at 531 (medical examiner who determined cause of death in performance of public duty and without consulting counsel in case did not develop information in anticipation of litigation or for trial). Because, though an expert, Dr. King did not acquire or develop his opinion as to the cause of Candace's

---

**5.** This is not to suggest that it would be permissible for an expert who has expressed one set of opinions, not developed in anticipation of litigation or for trial, to be called, without compliance with discovery requests, to express an entirely different opinion that was, indeed, developed for purposes of the litigation. Given the admirable ingenuity of trial attorneys, there may develop some fine lines in this area, but we are confident that our trial judges, assisted as needed by appellate guidance, are entirely competent to deal with them.

death in anticipation of the litigation or for trial, his identity and opinion were not required to be disclosed under Rule 2–402(e)(1), and the non-disclosure within the time set for disclosure of experts in the scheduling order did not violate Rule 2–421, Rule 2–504, or the scheduling order itself. No sanction, therefore, was warranted.[6]

In light of our conclusion that the court erred in excluding Dr. King's testimony from petitioners' case-in-chief, we need not address whether the court also erred in excluding Dr. King as a rebuttal witness.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE JUDGMENT OF CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AND REMAND TO THAT COURT FOR NEW TRIAL; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.

---

**6.** This ruling is not to be taken as a condonation of counsel's waiting until May 4, four months after being informed of Dr. Hutchins's identity, to take his deposition or of waiting until June 10, five weeks after the taking of Dr. Hutchins's deposition and only six days before the scheduled trial date, to inform defense counsel that he "may" call Dr. King. Had the deposition been taken sooner, within the period allowed for the completion of discovery, and had that advice been given promptly after the deposition, the trial court may well have reached a different conclusion, at least with respect to prejudice, and the parties may have been spared the expense of this appeal and the delay and expense of a new trial.