73 A.3d 1074

Victoria LITTLE

v.

Roger SCHNEIDER.

No. 88, Sept. Term, 2012.

Court of Appeals of Maryland.

Aug. 22, 2013.

---

Andrew H. Baida (Rosenberg, Martin, Greenberg, LLP, Baltimore, MD; Jonathan Schochor, James D. Cardea and Scott P. Kurlander of Schochor, Federico & Staton, P.A., Baltimore, MD), on brief, for Petitioner.

Wayne M. Willoughby, Gershon, Willoughby, Getz & Smith, LLC, Baltimore, MD, for Amicus Curiae brief of Maryland Association for Justice in Support of Petitioner.

Ward B. Coe, III (Hillary H. Arnaoutakis of Gallagher, Evelius & Jones, LLP, Baltimore, MD), on brief, for Respondent.

Argued before BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD and BELL,* JJ.

ADKINS, J.

Professional malpractice cases are unique in that the defendants are often highly trained and experienced professionals who possess credentials and specialized knowledge similar to that of an expert witness. In a medical malpractice case, like this one, there is a legal distinction between a defendant physician who testifies based solely on what she did and what she observed in her actual treatment of the patient (a fact witness), and a physician who gives opinions based upon facts and/or materials furnished to him during the course of litigation (an expert witness). *See, e.g., In re Application of Republic of Ecuador*, 280 F.R.D. 506, 511 (N.D.Cal.2012); *Carson v. Webb*, 486 N.W.2d 278, 281 (Iowa 1992). In this case, it is undisputed that Dr. Schneider testified solely as a fact witness. His status as a fact witness limits the proper scope of his witness accreditation, which in turn will affect the admissibility of evidence offered by the patient that he is not board-certified in vascular surgery. Likewise, as a fact witness, his substantive testimony is limited to an explanation of what he did or observed, and why, concerning the alleged malpractice. His testimony may not go beyond that.

## FACTS AND PROCEDURAL HISTORY

In May of 2007, Victoria Little, Petitioner, sought treatment at Vascular Surgery Associates. She complained of pain in

---

* Bell, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

her thighs and buttocks, which, it turned out, stemmed from a blocked aorta. Little was scheduled for a aortobifemoral bypass surgery to be performed by Respondent Dr. Schneider and Dr. Gonze on July 16, 2007. The goal of the surgery was to remove the buildup of plaque in the aorta and thereby restore appropriate blood flow to the pelvis and lower extremities. The surgery is performed by cutting the abdominal aorta below the renal arteries and then using a graft to connect the aorta to the femoral artery. The surgeon determines the proper size of the graft by visually inspecting the aorta during surgery.

During surgery, Drs. Schneider and Gonze chose to use a 16 × 8 mm graft. The suture used to connect the tissue to the graft, however, would not hold, causing Little to lose a large amount of blood. The doctors tried to complete the surgery several times, but the sutures continued to open up, making Little lose more blood with each attempt. Unable to complete the aortobifemoral bypass, Drs. Schneider and Gonze converted the surgery into an axillobifemoral bypass.

In this procedure, the bypass is performed at the axillary artery, which is then reconnected with the use of a graft to the femoral artery. The surgeons were able to complete the axillobifemoral bypass with the use of an 8 mm graft. But, by then, Little had lost 5100 ccs of blood—almost her entire volume of blood. As a result, there were severe surgical complications: Little became permanently paralyzed from the waist down and suffered temporary damage to her kidneys, liver, heart, lungs, and spinal cord.

At trial, Ms. Little's primary theory of negligence was based on an alleged mismatch in the size of her aorta and the size of the graft used in the initial attempt at completing the aortobifemoral bypass. Little contended that her aorta was 7–8 mm, and thus, the 16 × 8 mm graft was much too large. Dr. Schneider maintained that Little's aorta was 14 mm, and thus, the 16 × 8 mm graft was proper. The jury agreed with Little, finding that Drs. Schneider and Gonze had negligently performed the surgery and awarded Little $224,398 for past

medical expenses, $2,000,000 for future medical expenses, and $1,333,000 for pain and suffering.[1]

Dr. Schneider appealed, challenging two evidentiary rulings by the trial court: (1) allowing Little to question Dr. Schneider about his lack of board certification and (2) excluding from evidence a chest CAT scan, from an unrelated hospital visit, which allegedly showed Little's aorta. The Court of Special Appeals reversed on both issues. *See Schneider v. Little,* 206 Md.App. 414, 49 A.3d 333 (2012). Little petitioned for certiorari review in this Court, which we granted on November 16, 2012. *Little v. Schneider,* 429 Md. 303, 55 A.3d 906 (2012). We consider two issues:

1. Did the trial judge abuse his discretion in finding that evidence of Dr. Schneider's lack of board certification was admissible as a result of Dr. Schneider's extensive testimony regarding his accomplishments, credentials, and qualifications?

2. Did the trial judge abuse his discretion in prohibiting Dr. Schneider from testifying about a CAT scan that Dr. Schneider had never used in his treatment of Little?[2]

## DISCUSSION

### Admissibility of Physician's Board Certification Status

Ms. Little argues that the trial court was correct in allowing her, on re-direct examination, to inquire into Dr. Schneider's

---

1. The award for pain and suffering was reduced by the trial court to $650,000 in accordance with the cap on non-economic damages for a total judgment of $2,874,398 in favor of Little. Dr. Gonze entered into a settlement with Little after the trial and prior to this appeal.

2. We have rephrased the questions for brevity and clarity. In Little's Petition for Certiorari the questions were phrased as follows:

1. Is evidence of a physician's board certification status admissible when the physician is a defendant in a medical malpractice action, is called by the plaintiff as an adverse witness, and testifies about the physician's specialized knowledge, skill, and expertise?

2. Did the Circuit Court act in a manner well removed from any center mark and beyond the fringe of what is minimally acceptable by precluding Respondent from testifying about a CAT scan which played no role in, and was not relevant to, his treatment of Petitioner?

lack of board certification in vascular surgery.[3]   Dr. Schneider counters, claiming that evidence was inadmissible.   Both parties rely on *Dorsey v. Nold,* 362 Md. 241, 765 A.2d 79 (2001), to support their respective positions.

In *Dorsey,* we were presented with the question of whether a plaintiff may introduce into evidence the fact that the defendant physician had failed his board certification examination on his first attempt.   *Id.* at 249–51, 765 A.2d at 83–84. We held that such information was not admissible, explaining, "the general rule is that a physician's inability to pass a medical board certification exam has little, if any, relevance" in a medical malpractice suit.   *Id.* at 250, 765 A.2d at 84 (citations and quotation marks omitted).   That is so because "the fact of failure makes it neither more nor less probable that the physician complied with or departed from the applicable standard of care in the diagnosis or treatment of a particular patient for a particular condition."   *Id.* at 250–51, 765 A.2d at 84.

Little reads *Dorsey,* however, to say that it is only the physician's failure to pass the exam that is inadmissible, not the physician's current status of certification.   In support of this distinction, Little explains that in *Dorsey* the jury was informed of the fact that the physician was "not yet board-certified" at the time of the alleged malpractice.   *Id.* at 250, 765 A.2d at 83.   Because the jury in *Dorsey* was actually allowed to hear the physician's current certification status, Little argues, *Dorsey* cannot possibly stand for a rule that a physician's certification status is always inadmissible.

■  Schneider has a different take on *Dorsey,* using it to argue that his decision not to take the board certification examination is not relevant.   Just like Dorsey's failure of the

---

**3.**  Dr. Schneider was called as an adverse witness to testify during Little's case-in-chief.   During Little's direct examination, she was prohibited from discussing Dr. Schneider board certification status.   However—after Schneider testified, during cross-examination by his own counsel, regarding his vast professional experience and community service—the trial judge permitted Little to inquire into the subject on re-direct examination.

certification exam, Schneider avers, his choice not to take the exam makes it no more or less probable that he breached the standard of care in performing Little's surgery. The trial judge, he argues, had no discretion to admit this irrelevant evidence.

Schneider's reading of *Dorsey* is correct. That Dr. Schneider was not board certified makes it no more or less probable that he breached the standard of care in his treatment of Little. Yet, the doctor's argument based on *Dorsey* does not respond to what may be Little's best theory: that Schneider put his qualifications at issue. In other words, he "opened the door" to Little's use of the lack of board certification evidence.

### *"Opening the Door "*

The doctrine of "opening the door" to otherwise inadmissible evidence is based on principles of fairness. As we have stated: " 'opening the door' is simply a way of saying: 'My opponent has injected an issue into the case, and I ought to be able to introduce evidence on that issue.' " *Clark v. State,* 332 Md. 77, 85, 629 A.2d 1239, 1243 (1993). It is a method by which we allow parties to "meet fire with fire," as they introduce otherwise inadmissible evidence in response to evidence put forth by the opposing side. *See Terry v. State,* 332 Md. 329, 337, 631 A.2d 424, 428 (1993). In this regard, the "doctrine is really a rule of expanded relevancy." *Clark,* 332 Md. at 84, 629 A.2d at 1242. It "authorizes admitting evidence which otherwise would have been irrelevant in order to respond to ... admissible evidence which generates an issue."[4] *Id.* at 84–85, 629 A.2d at 1243.

Dr. Schneider's lack of board certification in vascular surgery was brought up several times in the course of this litigation. It was first raised pre-trial by Schneider himself in a motion in limine seeking to prevent Little from introducing

---

**4.** The doctrine may also allow a party to introduce otherwise inadmissible evidence to respond to "inadmissible evidence admitted by the court over objection." *Clark v. State,* 332 Md. 77, 85, 629 A.2d 1239, 1243 (1993).

the evidence at trial. During the motions hearing, Little's counsel argued that, as a matter of fairness, he should be permitted to use Schneider's lack of board certification to counter the picture—which he anticipated would be painted by the defense—that Dr. Schneider is the "greatest" vascular surgeon in the region. The trial judge ruled for Dr. Schneider but warned the parties that the order was "subject to the proviso that upon request during the course of the trial, said ruling is subject to reconsideration by this Court."

Apparently, the defense viewed the judge's favorable ruling as giving them a green light for introducing Dr. Schneider's experience and achievements, because counsel touted Dr. Schneider's credentials and qualifications during opening statements. Specifically, he stated that Schneider had gone to undergraduate school at Hamilton College and medical school at Case Western Reserve University. He emphasized that Dr. Schneider completed a five-year residency in surgery at John Hopkins, voluntarily elected to perform an additional year-long fellowship at Hopkins specializing in vascular surgery, and was hired by Hopkins to teach vascular surgery for the next eleven years. Defense counsel also stated that Dr. Schneider was instrumental in bringing a new state-of-the-art hospital into the community, and that he volunteered to serve as the Chairman of the hospital's Board of Directors, which is an unpaid position. All this, he said, occurred while Schneider was "a full-time practicing surgeon [who] is in the operating room three or four days a week."

The issue of board certification came up again when Little called Dr. Schneider as an adverse witness. She asked the trial court to revisit its ruling on the motion in limine. At that time, the trial judge refused to overturn his previous ruling, but cautioned defense counsel that unnecessary bolstering of Schneider, like that in the opening statement, could cause him to change his decision.

Defense counsel did not heed this warning. In his cross-examination of Dr. Schneider, he wasted no time: he went over all of Dr. Schneider's accomplishments, credentials, and

qualifications. This time, defense counsel went into even more detail then he did in opening statements, prompting Dr. Schneider to testify that:

- he had graduated from Hamilton College with honors and served as the president of the Senior Honor Society;

- in medical school at Case Western Reserve University he was selected to be on the Search Committee for a Dean, the Teaching Excellence Award Committee, and the Quality Assurance Teaching Committee;

- after medical school he was selected to complete a residency at John Hopkins;

- his initial residency lasted five years in which time he was able to perform all types of surgeries;

- he elected to spend an additional sixth year focusing solely on vascular surgery and was trained by "the Chief of Vascular Surgery, who is really one of the most preeminent vascular surgeons in the country, as well as another vascular surgeon who has written several textbooks on vascular surgery";

- his residency started with twenty-two interns, but by his fifth year he was one of only three still remaining, as the rest had been cut out of the program;

- he spent six months in an exchange program studying vascular surgery at Oxford University in England;

- when he came back to Hopkins, he was chosen as a Halstead Surgical Fellow to continue training in vascular surgery;

- upon the completion of his residency he was asked to stay on the faculty at Hopkins to teach vascular surgery while, at the same time, he was also a full-time practicing surgeon;

- by the time he completed his training at Hopkins he had performed 300 aortic procedures;

- he then formed his own private practice called Vascular Surgery Associates;

- at the time of trial he estimated that he had performed between 400 to 500 aortobifemoral by-pass surgeries;

- he had privileges at Upper Chesapeake Medical Center, Greater Baltimore Medical Center, St. Joseph Hospital, Harford Memorial Hospital, and Sinai Hospital;

- he served as the Chief of Surgery at Fallston General Hospital, the predecessor to Upper Chesapeake Medical Center, and as the Chairman of the Board of Directors, a position that is unpaid, of the Upper Chesapeake Health System;

- he was largely responsible for creating Upper Chesapeake by being in charge of the organization that raised funds to build the hospital;

- he had authored numerous publications in national medical journals;

- he belonged to several professional organizations, including Chesapeake Vascular Society, John Hopkins Medical and Surgical Association, and Halstead Surgical Society; and

- he volunteers for Health Link, which "is a charitable venture that Upper Chesapeake funds through donations from its foundation ... to take care of indigent patients, patients without medical insurance in Harford County." [5]

During this testimony, Little objected twice, on relevancy grounds, but the trial judge permitted Dr. Schneider to continue. Upon the completion of defense counsel's cross-examination of Schneider, Little once again asked the trial judge to revisit his original ruling on the motion in limine. Little argued that the doctor could not have it both ways: his accomplishments and great deeds were no more relevant than his lack of board certification. This time, the trial judge agreed, reversing his ruling and allowing Little to inquire, on re-direct, about Dr. Schneider's lack of board certification:

---

5. All in all, Dr. Schneider's accreditation covered eleven full pages of the transcript.

[W]hen I made my initial ruling pretrial, which I thought was correct, I did caution everybody it was subject to being revisited, depending on how much puffing went in, and, quite frankly, I am going to use the term puffing, but I am not in any way minimizing these things.

He is certainly very accomplished. He should be complimented. However, as counsel has indicated, what's the relevance of all those wonderful accomplishments to the issues before the Court? So what's good—there is a balance here. So if you are going to puff up, they get to puff down.

The trial transcript reveals that the judge was in tune with the progression of the trial and properly understood that the tables turned once Dr. Schneider engaged in extensive recitation of his many accomplishments on cross-examination. We have held that the doctrine of "opening the door" applies equally in opening statements, witness examination, and closing arguments. *See, e.g., Terry,* 332 Md. at 329, 631 A.2d at 424 (opening statement); *Oken v. State,* 327 Md. 628, 612 A.2d 258 (1992) (cross examination); *Mitchell v. State,* 408 Md. 368, 969 A.2d 989 (2009) (closing argument). Here, the "puffing" evidence was introduced during a phase of testimony known as "witness accreditation." We see no reason why the doctrine should apply any differently in this context.

Witness accreditation is an aspect of the witness examination process that has received scant attention in appellate opinions or legal treatises. It is a process by which a lawyer (usually the witness's counsel) elicits preliminary background information from the witness to "enhance a witness' credibility because the information portrays the witness as a real human being, not just an impersonal source of evidence." Paul Bergman, *Trial Advocacy In A Nutshell* 173 (2013). In other words, "the purpose of the accreditation process is largely ... to do whatever possible to make the jury receptive to the witness and his testimony before eliciting the key aspects of that testimony." Steven P. Grossman, *Trying the Case* 47 (1999). As we have explained:

It is a routine practice in trials for an attorney to ask his witness certain preliminary questions which may not be relevant to the issues being litigated, which may go beyond mere identification and which are designed to show that the witness will be somewhat credible or not biased in favor of the side calling him. For example, the educational background or professional status or employment position of a non-expert witness may be asked, or the witness's lack of prior contact with the side who has called him may be brought out. These questions give the jury some knowledge of the individual and a more complete perspective in considering his testimony.

*City of Baltimore v. Zell*, 279 Md. 23, 28, 367 A.2d 14, 17 (1977).

The legitimate process of accrediting a witness is not without limits, however. In *Zell*, we acknowledged that accreditation questions "serve the useful function of informing the jury about the witness," but the "extent to which such questions are permitted must ... remain in the sound discretion of the trial judge." 279 Md. at 28, 367 A.2d at 17; *see also White v. State*, 125 Md.App. 684, 695, 726 A.2d 858, 863 (1999). Thus, the key to deciding whether Dr. Schneider "opened the door" through his testimony during the accreditation is to examine the "reasonable limits" imposed by the trial judge on the accreditation process. In doing so, we are mindful that Schneider was not an expert; he was a fact witness testifying as an adverse witness in the plaintiff's case-in-chief.

With regard to fact witnesses, "[p]ersonal background questioning is usually quite short." Bergman, *supra* at 173. Ordinarily, it is not as extensive as that of an expert, because a fact witness will not give any opinions in the case. Therefore, the jury does not need to receive the same amount of detail as to his qualifications or credentials in order to decide whether he is credible. Thus, a judge is more likely to restrict the "reasonable limits" of accreditation of a fact witness.

■ Reviewing the transcript, we see that the trial judge, in establishing the "reasonable limits," was willing to give defense counsel some leeway in accrediting Dr. Schneider. The

judge originally granted Schneider's motion in limine, and, even after defense counsel's discussion during opening statement, refused to reverse his decision. But, at the same time, the trial judge made clear that, if defense counsel went too far in the accreditation of Dr. Schneider, he might allow Little to counter with Schneider's lack of board certification.

■ This is what ultimately happened. As defense counsel attempted to paint a picture of Dr. Schneider as a model of excellence in the field of vascular surgery and a great humanitarian, the trial judge became persuaded that he exceeded the basic background information appropriate for accreditation of a fact witness. *Zell,* 279 Md. at 28, 367 A.2d at 14. While such an accreditation might be appropriate for an expert, Dr. Schneider was testifying solely as a fact witness. Thus, it was reasonable for the trial court to conclude that, by going outside the reasonable limits of accreditation, Schneider placed at issue the question of his excellence in the field of vascular surgery and "opened the door" to rebuttal inquiry on re-direct examination. The trial judge did not abuse his discretion in allowing Little to ask Dr. Schneider, on re-direct, about his lack of board certification in order to counter Schneider's effort to cloak himself as the paragon of vascular surgeons.[6]

### *Plaintiff's Use of the Lack of Board Certification*

■ This is not to say that Little could have a free-for-all with Dr. Schneider's lack of board certification. The doctrine

---

**6.** Although this opinion affirms use of Dr. Schneider's lack of board certification, it should not be read so broadly as to condone generally the use of negative irrelevant facts regarding a physician. For example, even excessive puffing during defendant's witness accreditation does not justify introduction of evidence that the physician was previously sued for malpractice. The goal of the "opening the door" doctrine is to balance any unfair prejudice one party might have suffered. Ordinarily, evidence of prior malpractice suits is so prejudicial that it would tip the scale unfairly against the doctor. Thus, evidence of prior malpractice suits would not be permissible in cases like this one, "unless the defendant doctor injected this topic into the trial, for example, by testifying that he or she had never been sued for malpractice." *Lai v. Sagle,* 373 Md. 306, 323 n. 9, 818 A.2d 237, 248 n. 9 (2003).

of "opening the door" has limitations. *Clark*, 332 Md. at 87, 629 A.2d at 1244. It allows for the introduction of otherwise inadmissible evidence, but only to "the extent necessary to remove any unfair prejudice that might have ensued from the original evidence." *Savoy v. State*, 64 Md.App. 241, 254, 494 A.2d 957, 963 (1985). In this regard, Dr. Schneider argues that the trial court abused its discretion in allowing Little to improperly use the lack of board certification as evidence of negligence. Specifically, Dr. Schneider draws our attention to Little's use of the board certification evidence on re-direct examination and in closing argument. We review both for abuse of discretion.

On re-direct examination, Little's counsel had an opportunity to question Dr. Schneider about his lack of board certification:

Q. Good morning, Dr. Schneider. Yesterday we were talking about your background and training. [Defense counsel] asked you several questions about those issues . . . .

\* \* \*

Q. One of the questions [defense counsel] didn't ask you was whether or not you were board certified in vascular surgery. In fact, you are not board certified in vascular surgery, are you?

A. When I trained, there was no board in vascular surgery.

Q. The answer is you are not board certified in vascular surgery?

A. That's correct.

Q. You don't have a Certificate of Special Qualification in Vascular Surgery that you could have pursued later on either; is that correct?

A. I was not able to do that, no.

Q. At the time of your deposition, you weren't even sure whether you were currently board certified in general surgery.

A. I was not certain, but, in fact, I was.

Q. You are not board certified now?

A. I am not certain whether I am or not at this point.

\* \* \*

Q. It's a nice qualification to have, to say you are board certified in a specialty?

\* \* \*

A. I was not eligible to become board certified in vascular surgery. When I trained, there was no board in vascular surgery.

Q. Doctor, listen to my question. That's a nice qualification to have, isn't it, a board certification?

A. I disagree.

\* \* \*

Q. It's your testimony under oath that you don't know whether you are board certified in general surgery?

A. That's correct, I don't at this point.

Q. But you can tell us under oath that you are not board certified in vascular surgery?

A. I have never been board certified in vascular surgery.

As this colloquy demonstrates, Little's counsel's questions focused on Dr. Schneider's professional status, namely the board certification and whether Dr. Schneider viewed it as important. Once this was established, Little's counsel promptly moved on. This is in keeping with an appropriate witness accreditation—briefly eliciting preliminarily background information about a witness's educational or professional background and then moving on to the substantive testimony. In other words, in this instance, Little used the lack of board certification only to the extent necessary to counter the potentially unfair prejudice created by defense counsel had the overblown accreditation of Dr. Schneider gone unaddressed. We find no abuse of discretion on the part of the trial judge in allowing Little's questions on redirect examination.

Little's counsel, however, did not stop there. He returned to Dr. Schneider's lack of board certification in closing argument. This time, he used it to call into question Dr. Schneider's general credibility, implying that he had lied to the jury:

Every physician who testified in this case was board certified except for Dr. Schneider. I asked Dr. Schneider, Board certification is a big deal, isn't it, doctor? Oh, no, absolutely not. That is not a big deal at all. So, Dr. Suggs, the very expert witness for Dr. Schneider, comes in.... Dr. Suggs, you said that you were board certified. We can agree that is not really that big of a deal, is it? Oh, I disagree, it is a big deal. I'm not saying Dr. Schneider is a lesser doctor because he is not board certified, but **the fact that he would come into this courtroom and try to tell you it is not a big deal to be board certified when his own expert witnesses know that that is not true tells you about his credibility in this case.** (Emphasis added.)

■ We read this closing as an attempt to use the lack of board certification evidence to challenge the truthfulness of Dr. Schneider's entire testimony. If Dr. Schneider had objected, and the trial court had sustained his objection, we might well agree that Little's counsel had gone too far at this point.[7] Yet, Dr. Schneider failed to object to this statement at trial. As a result, any complaint Dr. Schneider may have with regard to Little's closing argument is waived and not preserved for appellate review. *See Farley v. Allstate Ins. Co.,* 355 Md. 34, 58, 733 A.2d 1014, 1026 (1999) ("Even if Allstate's comments during closing arguments were prejudicial and resulted in an inadequate verdict, it was incumbent upon Farleys' counsel to immediately object so that the trial judge could promptly rule on the matter."); *see also Warren v. State,* 205 Md.App. 93, 132–33, 43 A.3d 1098, 1120 (2012) ("The record reveals that appellant failed to lodge any objection

---

7. That Little was allowed to introduce the lack of board certification to counter the advantage that Dr. Schneider gained through his inappropriate witness accreditation does not mean that she should be allowed to use the evidence to create her own, albeit small, advantage over Dr. Schneider.

whatsoever during the State's closing argument.... As such, any issue as to the prosecutor's remarks is not preserved for appellate review.").

## Exclusion of the CAT Scan

■ Schneider also complains that the trial judge improperly excluded a chest CAT scan, which allegedly could be used to determine the actual size of Little's abdominal aorta. Schneider argues that Little's central theory of negligence was the "mismatch between the size of the aorta and the graft," and therefore, the actual size of Little's aorta was a fact of consequence to the outcome of the action. Thus, he avers, because the CAT scan could illuminate the actual size of Little's aorta, it is relevant evidence and should not have been excluded.

Little responds that the CAT scan was not relevant because it was from an unrelated medical procedure which played no part in Dr. Schneider's treatment of Little. In Ms. Little's opinion, the scope of relevant evidence is confined to that which Dr. Schneider actually used in treating Little. And, because Dr. Schneider had never previously used this CAT scan, it was irrelevant.

On this point, we agree with Dr. Schneider. Little draws too narrow of a definition of relevancy. Maryland Rule 5–401 defines relevant evidence broadly as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." It is clear from the record, that the size of Little's aorta was the central fact of consequence in this case. Thus, if the CAT scan could aid in determining the size of Little's aorta, it may be relevant under Rule 5–401.[8]

---

**8.** Little makes the argument that this CAT scan was not relevant at all because it was a scan of Little's *chest*, and the trial was concerned with the size Little's *abdominal* aorta. Yet, this CAT scan is not in the record before us, and thus, as an appellate court, we are not in a position to make the factual determination regarding how much of the body is

Determining relevancy, however, is only the first step. Dr. Schneider still had to have a witness who could identify and interpret the CAT scan. In this regard, the trial judge found that none of Schneider's experts reviewed or relied on this CAT scan in forming their opinions, and he excluded their testimony on this point. Neither party challenges this ruling.[9]

In excluding the proffered exhibit, the trial judge also inquired into Dr. Schneider's use of the CAT scan. Little's counsel explained to the trial judge that Schneider had never used this CAT scan in his treatment of Little,[10] and defense counsel admitted as much. The trial judge asked Dr. Schneider's counsel: "can you cite me to anything that any of your folks, either your individual clients or your experts, where they [looked at this CAT scan]." In response, all defense counsel could come up with was one line from Dr. Schneider's deposition in which he referenced CAT scans generally as one method by which one can measure the size of a vessel:

> Question, Are there any radiographic studies that can—let me rephrase it. Are there any radiographic studies from which you can assess the size of a vessel? Answer, CAT scans and some types of aortograms if there is a marker catheter present will allow you to.

Defense counsel relied upon this generic reference to show Dr. Schneider's use of the CAT scan. Yet, as the trial judge

---

depicted in a chest CAT scan. Dr. Schneider proffered that this CAT scan could be used to show the size of Little's abdominal aorta, and we have no reason to question this proffer.

**9.** The trial judge also excluded the CAT scan based on a discovery violation, but Little does not rely on that theory in this Court.

**10.** Little's counsel had the following colloquy with the Court:

The Court: So, [the CAT scan] wasn't any part of [Dr. Schneider's] treatment?

[Plaintiff's Counsel]: Right.

The Court: Or decision making?

[Plaintiff's Counsel]: Nothing to do with his decision making.... They were asked questions repeatedly about what they did, what they revealed, why they did this and why they did that, and [the CAT scan] never came up in that context.

properly noted: "He didn't point to this one. He just said CAT scans in general." Thus, it is clear from the record that one of the trial judge's reasons for excluding the CAT scan was the complete lack of any indication that Dr. Schneider used or relied on this CAT scan in his treatment of Little.

Nevertheless, Dr. Schneider argues that, because he was a fact witness, he should have been permitted to testify about the CAT regardless of whether he used it in his treatment of Little. This is because, in Schneider's opinion, the "CAT scan was an objective, factual image" upon which he "would merely have had to identify the aorta ... and compare it to the calibration on the image." In this regard, Dr. Schneider argues that "[i]n medical malpractice trials, defendants regularly testify about their training, qualifications, and experiences and a variety of medical and surgical subjects without being designated as experts." He fears that "[i]f they were not allowed to do so, they could not defend themselves." To illustrate this point, Dr. Schneider analogizes the CAT scan to other parts of his testimony in which, for example, he was permitted to use a demonstrative aid in explaining the axillary by-pass procedure he performed, and the identification of several vessels on that demonstrative aid.

As we said before, Dr. Schneider acknowledges that he was only a fact witness, not an expert. It is well established that fact witnesses must have personal knowledge of the matters to which they testify. *See Walker v. State,* 373 Md. 360, 388 n. 8, 818 A.2d 1078, 1094 n. 8 (2003) ("[T]he threshold standards for calling any fact witness are merely that the witness have personal knowledge of the matter attested to and that the matter be relevant to the case at hand."). As we explained in *Dorsey*—a medical malpractice action—when a defendant physician testifies as a fact witness, the physician's testimony must be "limited to a recitation of what he observed and what he did on the occasion of [the patient's] visit." 362 Md. at 251, 765 A.2d at 84.

In this regard, the trial judge clearly found that Dr. Schneider lacked the necessary personal knowledge. The trial

judge specifically inquired into Schneider's use of the CAT scan and found that Dr. Schneider never reviewed the CAT scan, never considered the CAT scan, and never relied upon the CAT scan. Indeed, the trial judge could find no indication at all that Schneider even knew that the CAT scan existed when he was treating Little. Clearly, then, it was within the trial judge's discretion to prohibit Dr. Schneider from testifying about this CAT scan because such testimony would have gone outside the realm of Schneider's personal knowledge regarding what he did and what he observed in the treatment of Little.[11]

## CONCLUSION

When a defendant physician testifies as a fact witness, the defense must limit the witness accreditation and substantive testimony to that of a fact witness. In this case, Dr. Schneider's witness accreditation exceeded the reasonable limits for accreditation of a fact witness because it inquired extensively into his professional accomplishments. His attempt to testify regarding the CAT scan likewise would have gone beyond the legitimate testimony of a fact witness because Schneider had no personal knowledge of the scan. Therefore, the trial judge did not abuse his discretion in either allowing Little to discuss Dr. Schneider's lack of board certification or excluding the CAT scan.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

---

11. Likewise, Dr. Gonze could not have introduced the CAT scan evidence for the same reason Dr. Schneider could not: he had no personal knowledge of the existence of the CAT scan during his treatment of Little.