*Wallace & Gale Asbestos Settlement Trust v. William Edward Busch, Jr., et ux.*, No. 58, September Term 2018. Opinion by Harrell, J.

**HEADNOTE[S]**

**ASBESTOS – LIABILITY – CIRCUMSTANTIAL EVIDENCE – REASONABLE INFERENCES**

In Maryland, a plaintiff must prove exposure to a specific defendant's asbestos-containing product or products to prove that the product or products were a substantial causative factor in the plaintiff's mesothelioma. A plaintiff may satisfy this requirement through circumstantial evidence, from which reasonable inferences may be drawn. In this case, the plaintiffs satisfied this burden by producing evidence that, although offering no direct evidence of the defendant's employees installing the asbestos-containing products within the boiler room where the bystander plaintiff worked (and was exposed to asbestos from the insulation of the boilers and pipes) at a high school construction project, the defendant was the primary (if not sole) heating pipe/equipment insulator on the high school project and the defendant insulated fire lines in the boiler room, albeit with non-asbestos insulation.

**EVIDENCE – "OPENING THE DOOR" DOCTRINE**

The "opening the door" doctrine expands relevancy in an attempt to remedy potential confusion regarding other admitted evidence. It renders relevant evidence, which would be otherwise irrelevant, through an opposing party's prior admission of evidence relating to the same issue. A party is entitled to respond and introduce competing evidence, in order to prevent jury confusion, when the "door" is "opened" by the opposing party injecting an issue into the litigation which has the potential to confuse the jury.

IN THE COURT OF APPEALS
OF MARYLAND

No. 58

SEPTEMBER TERM, 2018

WALLACE & GALE ASBESTOS
SETTLEMENT TRUST

v.

WILLIAM EDWARD BUSCH, JR., ET UX.

Barbera, C.J.,
*Greene
McDonald
Watts
Hotten
Getty
Harrell, Glenn T., Jr.,
    (Senior Judge, Specially Assigned)

JJ.

Opinion by Harrell, J.
Getty, J., dissents.

Filed: July 3, 2019

*Greene, J., participated in the hearing of the case, in the conference in regard to its decision and in the adoption of the opinion but he retired from the Court prior to the filing of the opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

"'Nearly' only counts in horseshoes and hand-grenades."
NEIL GAIMAN, THE GRAVEYARD BOOK (2008).

"'Almost' only really counts in horseshoes and hand-grenades."
GREEN DAY, *Horseshoes and Handgrenades*, on its album, 21ST CENTURY
BREAKDOWN, (Reprise Records 2009).

We perceive that the flagship question in this case asks essentially to what degree, if at all, the aphorism expressed in Neil Gaiman's and Green Day's works might apply to the evidence offered of the defendant's liability in this asbestos mesothelioma civil litigation. At risk here is a $14,568,628.33 jury verdict, reduced to $7,284,264.17, returned in favor of Respondents William Edward Busch, Jr. ("Mr. Busch") and his wife, Kathleen ("Mrs. Busch") (collectively "the Buschs"), after a 14-day trial in the Circuit Court for Baltimore City. The jury found that Mr. Busch contracted mesothelioma as a result of his exposure to asbestos-containing materials installed by insulation contractor Wallace & Gale, Co. ("W&G")[1] during the construction of Loch Raven High School ("LRHS") in Baltimore County. Mr. Busch worked for Honeywell Corporation during the relevant time period, performing non-insulation work in the boiler room of LRHS, the area where the asbestos exposure occurred. Although Mr. Busch did not himself install asbestos-containing products, nor was any direct evidence produced linking W&G to any asbestos-containing products in the construction at LRHS (let alone in the boiler room), the jury was

---

[1] W&G was the predecessor to Petitioner, Wallace & Gale Asbestos Settlement Trust ("WGAST"). In 1984, W&G petitioned for Chapter 11 bankruptcy protection. A bankruptcy settlement trust named WGAST was created pursuant to a reorganization plan approved by the Bankruptcy Court in 2002.

convinced, apparently by circumstantial evidence (and inferences drawn therefrom), that W&G was responsible more likely than not for installing the asbestos-containing insulation in the boiler room.

The Court of Special Appeals affirmed the judgment in a reported opinion.[2] WGAST petitioned this Court for a writ of certiorari. We granted the petition and issued our writ. *Wallace & Gale Asbestos Settlement Tr. v. Busch*, 462 Md. 84, 198 A.3d 219 (2018).

## QUESTIONS PRESENTED

WGAST presents two questions for consideration. We have rephrased the questions thusly:[3]

I.  Is it sufficient to rely on circumstantial evidence to infer that a defendant, whose presence was substantial in the general insulation of plumbing, heating, and ventilation surfaces during construction in a high school building, was responsible for the asbestos exposure and resulting illness of a plaintiff who worked only in a specific room of the building and where there was no direct evidence linking that defendant to the asbestos insulation installed in that room?

II. Is it permissible to inform a jury that a co-defendant to the asbestos lawsuit had been dismissed when a remaining defendant "opens the door" by

---

[2] *Wallace & Gale Asbestos Settlement Trust v. William Edward Busch, Jr., et ux*, 238 Md. App. 695, 194 A.3d 401 (2018).

[3] WGAST's questions were:
   I.  May asbestos exposure to a specific defendant's product be inferred from the defendant's substantial presence elsewhere in the facility?
   II. Should juries be told that other defendants have been dismissed from the case when the complaints against them are admitted in evidence as admissions by the plaintiff?

- 2 -

introducing evidence relating to the earlier presence of that now-dismissed party?

For reasons we shall explain, we answer both questions in the affirmative and affirm the Court of Special Appeals' judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### Mr. Busch

At the time of trial, Mr. Busch was a 70-year-old retiree. He began his career as an apprentice steamfitter[4] in 1967 at a Baltimore construction company, Lloyd E. Mitchell ("Mitchell"). During his four years at Mitchell, he worked on at least four building projects in Baltimore and its surrounding area, alleging in the present litigation asbestos exposure at all four sites.[5]

Mr. Busch left Mitchell in 1971 for Honeywell Corporation ("Honeywell"). He worked at Honeywell for 30 years, installing primarily thermostats, sensors, relay stations, fan control systems, and automatic temperature-control devices. Mr. Busch's work in this regard was typically one of the final phases of the construction process – when he performed work for Honeywell on construction sites, "most of the job sites were pretty much completed and finished . . . [he was] the last one in there for the thermostats and controls." He testified at trial in the present case that he was exposed to asbestos at various

---

[4] A steamfitter installs heating, ventilation, and air conditioning (HVAC) equipment in buildings.

[5] Although Mr. Busch claimed exposure to asbestos fibers at various job sites from his time at Mitchell, the claims germane to this litigation relate solely to his time at Honeywell, a subsequent employer.

job sites, including LRHS.[6]  Mr. Busch left Honeywell in 2001 for a local construction firm, where he assumed the role of project manager and department head.  He retired in 2016 when he was diagnosed with mesothelioma.

## Loch Raven High School

The general worksite at issue in this case was LRHS.  The specific worksite for Mr. Busch was its boiler room.   Mr. Busch worked in the boiler room at LRHS for approximately three or four months during the winter of 1971 and into the early spring of 1972.   The boiler room contained two fifteen-foot by twenty-foot boilers.  The room measured forty-feet by forty-feet.  Mr. Busch performed his usual work for Honeywell in close proximity to the boilers.

Building specifications for LRHS called for magnesia blocks to be used to insulate the boilers.  By weight, magnesia block contained up to 15% asbestos.  According to testimony, workers would cut the magnesia block into smaller, but still large, blocks before placing them around the boilers.  This cutting created a "snow storm" of asbestos dust, which was inhaled inevitably by those nearby, including Mr. Busch, even though he wore a respirator.  The cement mixture used to cover the magnesia block insulation contained asbestos as well.

## Pre-Trial Discovery Responses and Depositions Received in Evidence

Mr. Busch, in response to pre-trial defense interrogatory requests, identified McCormick Asbestos Company (McCormick) and Georgia-Pacific, LLC, as the

---

[6] Mr. Busch averred that he was exposed to a "snow storm" of dust when the insulation blocks at LRHS were cut to insulate the boilers (discussed further below).

responsible sources of products leading to his asbestos exposure at LRHS. He claimed that the asbestos-containing insulation products were "sold, supplied, and installed by McCormick[.]"[7] Additionally, he stated that he came in contact there with an "asbestos-containing joint compound manufactured, sold and supplied by Georgia-Pacific, LLC." Mr. Busch provided the names of two other Honeywell workers who had supposed personal knowledge of the asbestos exposure at LRHS – Richard Huettel ("Huettel") and Howard Sheppard ("Sheppard").

In response to Mr. Busch's interrogatories, WGAST produced a trove of documents 48 days before trial.[8] The documents supported the existence of a contractual relationship between W&G and Poole & Kent Co. ("Poole").[9] Poole, as testified to later by Huettel in his deposition (which was received in evidence), was the mechanical contractor at LRHS. Poole's contractual obligations included employing plumbers and steamfitters to install the piping systems for the LRHS boilers. The inferred contract between Poole and W&G provided $145,250.00 as the total consideration due to W&G for its work at LRHS.[10] The job, referred to as Job #5679, called for W&G to insulate the "plumbing, heating and

---

[7] In his trial testimony, Mr. Busch stated that he did not know the identity of the employer of the persons that performed the insulation work in the LRHS boiler room.

[8] WGAST's responses came after fact discovery had been closed. The Buschs do not complain on appeal, however, regarding any discovery violation.

[9] Although the documents did not include an original or copy of a contract, references in the documents referred to a contract or agreement.

[10] According to the United States Department of Labor, Bureau of Labor Statistics, this amount is equivalent to approximately $889,566.13 in 2019 dollars.

ventilating surfaces" at LRHS. It is not crystal clear what constituted the "surfaces" or where most were located, but other documents indicated specifically that W&G, among other responsibilities, insulated "fire lines" in the boiler room at LRHS during the time Busch worked also in the boiler room.[11]

Partial billing statements relating to Job #5679 were produced by WGAST. The first was from W&G to Poole, dated 16 February 1972. The statement indicated that W&G had "insulated various plumbing, heating and ventilating surfaces" at LRHS. The second, again relating to Job #5679, was sent on 15 May 1972. These billing statements totaled less than $20,000.00, but stated that the total value of Job #5679 was $145,250.00.

Timesheets for W&G insulators were produced regarding Job #5679. The timesheets revealed that their work at LRHS lasted from February to June 1972, and that the workers spent over 4,500 person-hours at LHRS during that period.

Additional invoices, order forms, and shipment records produced by WGAST connected further W&G to Job #5679 in LRHS, but did not refer specifically to W&G with regard to asbestos-containing products used or installed at LRHS. A "partial billing" for Job #5679 sent by W&G to A.C. MacDonald Inc. was the only document connecting directly W&G to work in the boiler room, as opposed to elsewhere at LRHS. This "partial billing" was for insulation work performed on fire lines in the boiler room. Construction

---

[11] Neither party attempted at trial to define what a fire line is and how it may be different from other equipment in the boiler room. In its closing argument, WGAST stated that fire lines are: "[S]prinklers. Those are the little sprinkler lines that put out fires." Closing arguments, however, are not evidence.

specifications for the fire lines in LRHS provided that fiberglass or "foamglass" shall be used as insulation for those lines. Neither fiberglass nor foamglass contained asbestos.

## Trial & Direct Appeal

Mr. Busch brought suit initially against seven defendants, alleging occupational exposure to asbestos-containing products resulting in his mesothelioma.[12] Three were dismissed prior to trial. Thus, by the time trial began, only four defendants remained.[13]

At trial, Mr. Busch testified that he did not remember who installed, supplied, or manufactured the block insulation and cement used to insulate the boilers and pipes in the boiler room.[14] He produced competent evidence, however, if believed by the factfinder, demonstrating that the dust created by the sawing of the insulation blocks contributed to his contracting mesothelioma.

WGAST acknowledged that W&G insulators performed work at LRHS, but claimed that no evidence had been produced by Mr. Busch linking W&G to the asbestos-containing insulation used in the boiler room at LRHS. According to WGAST, the evidence placed W&G workers and products in the boiler room only for the limited purpose of insulating the fire lines, which insulation contained no asbestos.

---

[12] The seven defendants were: WGAST; McCormick; Union Carbide Corporation; E.L. Stebbing & Company; Hampshire Industries, Inc.; Lloyd E. Mitchell, Inc.; and Georgia-Pacific, LLC.

[13] WGAST; Georgia Pacific; Hampshire Industries, Inc.; and, E.L. Stebbing & Company were the remaining defendants. The Buschs settled with Hampshire Industries and E.L. Stebbing before the case was submitted to the jury, leaving WGAST and Georgia Pacific as the two remaining defendants at the close of evidence.

[14] But *see* supra at 5.

Huettel's deposition, read into evidence by WGAST, revealed that he was a friend and co-worker of Mr. Busch. Huettel and Mr. Busch worked together closely at various jobsites, including LRHS, over an eight-year span. Consistent with Mr. Busch's interrogatory answers (if not his trial testimony), Huettel's deposition testimony indicated that McCormick installed the asbestos-containing block insulation and cement on the boilers at LRHS.

WGAST moved successfully into evidence also the deposition testimony of Sheppard. Sheppard was an electrician who performed work at LRHS in 1970-71, before Busch worked at LRHS. Sheppard did not know Busch personally and testified only as a "general product identification witness."[15] In a vein similar to Huettel's testimony, Sheppard claimed that he saw McCormick workers apply asbestos-containing materials to insulate the pipes and boilers in the boiler room. Neither Huettel nor Sheppard identified W&G as responsible for this work or connected in any way W&G to the asbestos-containing insulation in the boiler room at LRHS.

As noted earlier, at the close of all evidence, only WGAST and Georgia-Pacific remained as defendants. The jury returned a verdict in favor of the Buschs against both defendants. The jury awarded Mr. Busch $318,528.33 for past medical expenses, $1,250,000.00 for past and future economic loss, and $10,000,000.00 for non-economic losses. Mrs. Busch was awarded $3,000,000.00 for loss of consortium. The total verdict

---

[15] A general product identification witness testifies typically as to the conditions and activities of a jobsite, but not in relation to the exposure of a specific plaintiff.

was $14,568,528.33. The circuit court reduced the verdict to $7,284,264.17 because of the effect of cross-claims against absent defendants. WGAST moved subsequently for JNOV, a new trial, and, in the alternative, remittitur. The circuit court denied all motions. WGAST appealed timely to the Court of Special Appeals.[16]

The Court of Special Appeals affirmed. The intermediate appellate court held first that sufficient evidence existed for the jury to infer that it was likely or probable that W&G performed the insulation work (with asbestos-containing products) in the boiler room at LRHS during the time Mr. Busch worked in the boiler room. The intermediate appellate court held also, of relevance here, that the trial judge did not abuse her discretion in allowing the Buschs to inform the jury that McCormick had been dismissed as a defendant.

## I.

WGAST contends that Mr. Busch did not present evidence sufficient to prove directly or by reasonable inference that he was exposed to asbestos-containing products manufactured, sold, or installed by W&G. Because of this deficiency, the issue of its potential liability was not proper to submit to the jury.

## STANDARD OF REVIEW

We review a "trial court's decision to [] deny judgment or JNOV to determine whether it was legally correct[.]" *Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 503, 16 A.3d 159, 163 (2011) (internal citations and quotations omitted). We analyze the trial court's decision "viewing the evidence and the reasonable inferences to be drawn from it

---

[16] Georgia-Pacific noted an appeal as well, but settled with the Buschs before the appeal was decided.

in the light most favorable to the non-moving party[.]" *Id.* The denial of a JNOV will be upheld if there is "any evidence adduced, however slight … from which reasonable jurors, applying the appropriate standard of proof, could find in favor of the plaintiff on the claims presented." *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 333, 71 A.3d 30, 48, on reconsideration in part, 433 Md. 502, 71 A.3d 150 (2013).

## DISCUSSION

In an "asbestos case," a plaintiff must demonstrate first that his or her exposure to an asbestos-containing product was a substantial causative factor in the development of mesothelioma or other injury. *Eagle-Picher Industries, Inc. v. Balbos*, 326 Md. 179, 210, 604 A.2d 445, 460 (1992). We adopted in *Balbos* a "frequency, proximity, and regularity" standard, borrowed from the Fourth Circuit's decision in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1160 (4th Cir. 1986), by which to assess causation evidence in asbestos cases. *See Balbos* 326 Md. at 210, 604 A.2d at 460. *Balbos* involved consolidated tort actions brought by two former shipyard workers, both of whom inhaled asbestos fibers at the shipyards where they worked. *Id.* at 186, 604 A.2d at 448. Both men succumbed to mesothelioma. At issue was the causal relationship between the co-defendants' asbestos products and the plaintiffs' exposure to it. Similar to the case at bar, both of the *Balbos* plaintiffs' direct work activities did not involve asbestos-containing products. *Id.* at 210, 604 A.2d at 460. As such, they were bystanders relative to the asbestos-related work or products. *Id.* Regarding the bystander status of the plaintiffs, we observed:

> Whether the exposure of any given bystander to any particular supplier's product will be legally sufficient to permit a finding of substantial-factor causation is fact specific to each case. The finding involves the

interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace. This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff. Within that context, the factors to be evaluated include the nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product.

*Id.* Thus, a bystander plaintiff must prove that a defendant's asbestos-containing products were a substantial causative factor in the illness. He/she may do so by demonstrating that: (1) the product was used frequently; (2) he/she worked in close proximity to the product or products, in both distance and time period; and, (3) he/she was exposed regularly to the product or products. No single factor is determinative.

Maryland rejects what is known as the "fiber drift" theory of causation. In other words, "a plaintiff must present evidence to show that he inhaled asbestos fibers shed by the specific manufacturer's product." *Reiter v. Pneumo Abex*, LLC, 417 Md. 57, 71, 8 A.3d 725, 733 (2010) (internal quotations omitted). In *Reiter*, shipyard workers, diagnosed with asbestos-related maladies, alleged exposure to asbestos dust emitted from the braking mechanisms of cranes at their place of work. The plaintiffs worked at a large facility, approximately the size of an airplane hangar. *Id*. at 70, A.3d 733. There were at least six cranes throughout the shipyard suspended approximately twenty-five to thirty feet in the air. *Id.* at 73-74, A.3d 735. We affirmed the circuit court's grant of summary judgment because the plaintiffs did not produce evidence that placed the defendant's asbestos products at the specific site within the shipyard where the plaintiffs worked. *Id.* (stating "[e]vidence that some [of the defendant's asbestos] products were used somewhere in the

480-acre tin mill does not establish that [the defendant's asbestos] product was on the crane that was in the 50 square feet where Mr. Reiter 'actually worked.'"). Pertinent to this case, we described "the 'specific site' where each decedent worked was the limited area in the facility where the decedent was located on a day-to-day basis. *While a "boiler room" . . . may constitute a specific site*, a factory the size of an airplane hangar does not." *Id.* (emphasis added).

      *1. Was there sufficient evidence presented to hold liable W&G*

        *for the asbestos-containing products in the boiler room at*

        *LRHS?*

The crux of WGAST's question on appeal is whether it was demonstrated sufficiently at trial to submit to the jury the question of whether W&G was responsible for installing the asbestos-containing products in the boiler room at LRHS.

WGAST contends that the judgments of the circuit court and Court of Special Appeals represented a "game-changing departure from established Maryland legal principles" in concluding that "a reasonable jury could have inferred permissibly that W&G was the primary, if not the only, insulation contractor present during the construction of LRHS, and, therefore, that W&G was responsible for the installation of asbestos-containing insulation in the boiler room." *Wallace & Gale Asbestos Settlement Trust*, 238 Md. App. at 710, 194 A.3d at 409. Further, it avers that, because Mr. Busch presented no direct evidence at trial connecting W&G to the asbestos-products in the boiler room or, for that matter, anywhere at LRHS, the jury verdict as to its liability amounted to mere speculation. It concludes its trifecta of arguments with a policy plea – allowing a defendant

to be held liable based on its mere substantial presence in or at a larger workplace is akin to a market-share theory of liability, an approach rejected in Maryland.

We conclude, as did the Court of Special Appeals, that the evidence presented at trial regarding W&G's work at LRHS was sufficient to allow the case to go to the jury and for the jury to conclude that W&G was liable. The trial judge assessed whether a reasonable jury could conclude that the preponderance standard was met. Under that standard, she was tasked to determine whether Mr. Busch presented sufficient evidence to allow the jury to determine if it was *more likely than not* that W&G performed the insulation work in the boiler room with asbestos-containing products. Circumstantial evidence was presented such that a reasonable factfinder could have found by a preponderance of the evidence that W&G performed the asbestos insulation work in the LRHS boiler room.

The Buschs moved successfully into evidence numerous documents relating to W&G's work at LRHS, including, but not limited to: time sheets showing that W&G spent over 4,500 person-hours in the construction at LRHS; partial billing statements for Job #5679 indicating that W&G had insulated plumbing and heating surfaces at LRHS; invoices reflecting partial payment for work performed at LRHS; and, partial invoices for the fire lines work W&G performed in the boiler room.[17] The nature of the documents produced during discovery suggested that document production regarding W&G's work at

---

[17] No party adduced evidence that any other entity was engaged to perform (or, in fact, performed) heating pipe or equipment insulation at LRHS.

LRHS was fragmentary. For instance, although timesheets produced indicated that W&G spent over 4,500 person-hours at LRHS and the total value of the job was $145,250.00, invoices reflected only a partial payment for $20,000.00. This is either indicative of an enormous write-down, or, more plausibly, gaps in the production of documents in pretrial discovery regarding the LRHS job.[18]

Viewing the evidence in the light most favorable to Busch, a reasonable factfinder could have inferred that W&G was more likely than not responsible for all of the insulation work at LRHS during the time Mr. Busch worked in the boiler room. First, it is not a hyper-extended stretch for the trial jury to draw an inference that W&G was the primary, if not only, insulation contractor working in LRHS.[19] A reasonable jury could have reached that conclusion from facts such as W&G's apparently broad contractual undertaking for "insulat[ing] various plumbing, heating and ventilating surfaces" and the thousands of hours W&G spent working at LRHS. Additionally, other documentation put W&G in the boiler room performing insulation work on the fire lines, albeit with insulation free of asbestos. As this reasoning goes (especially in the absence of any reason suggested for

---

[18] There could be multiple benign explanations for these gaps. W&G's work at LRHS took place in the early 1970s. Discovery and trial in this case occurred in 2016 and 2017. Record retention policies (or the lack thereof) over the 45-year interlude might explain why there were gaps and incompleteness in W&G's response to discovery. This is but one possible explanation.

[19] WGAST points out that an inference is "a fact determined through logical deduction from other proven facts[,]" to support its contention that the only inference permissible from the evidence presented is that W&G was the primary insulator at LRHS. Although that is certainly one reasonable inference that could have been drawn potentially by the jury, we believe that there are other permissible inferences which could have been (and were in fact) drawn.

why another insulation contractor may have been hired or was necessary to perform the limited task of insulating the boilers with asbestos-containing insulation), an inference could be drawn reasonably that it was unlikely that another insulation contractor would be hired for the limited objective of insulating the boilers with asbestos-containing product where W&G had a building-wide insulation contract and was performing some insulation work in the boiler room, albeit not involving asbestos-containing insulation.

WGAST argues that not one piece of direct evidence placed Mr. Busch in the same location at the same time that W&G used an asbestos-containing product in that space, so the jury's verdict amounted to impermissible speculation. In asbestos cases, however, circumstantial evidence (and reasonable inferences available therefrom) can be sufficient to establish exposure, and liability. *See Scapa Dryer Fabrics, Inc.*, 418 Md. at 511, 16 A.3d at 167; *see also Balbos*, 326 Md. at 210, 604 A.2d at 460. Based on the evidence highlighted above, the jury was entitled to infer that W&G was likely the insulator responsible for the asbestos-containing products in the LRHS boiler room.

WGAST likens the use of circumstantial evidence and inferences here to a market-share liability approach. A market-share liability approach apportions liability among manufacturers based on their respective share of the market for the injury-causing product. WGAST points out correctly that Maryland rejects such an approach in asbestos cases. *See, e.g., Reiter,* 417 Md. at 65, 8 A.3d at 730 (stating that market-share liability is not recognized under Maryland law).

WGAST's argument that the courts considering this litigation before us applied an improper market-share liability theory conflates inappropriately consideration of W&G's

- 15 -

substantial presence in LRHS with W&G's share of the asbestos-containing products market. Indeed, W&G performed a substantial amount of work at LRHS. Market-share liability, however, is premised on a manufacturer's share of the marketplace for a product, not its presence on, or "share" of, a single construction job site.

Mr. Busch (in his interrogatory answers), Huettel, and Sheppard (in their depositions read into evidence) testified, to varying degrees of certitude, that McCormick was the contractor responsible for the asbestos-containing insulation installed in the LRHS boiler room. WGAST sees this testimony as exonerating W&G. Because of this, the Court of Special Appeals erred in ruling that the jury was free to disregard this evidence and rely instead on other and more attenuated evidence that was arguably more generous to Mr. Busch's claim. WGAST points to cases, many from foreign jurisdictions, to support this notion. In essence, WGAST argues that because the testimony that McCormick installed the asbestos-containing insulation was uncontroverted, the trial court should have granted JNOV. We are not persuaded by this argument. Although there was evidence which identified McCormick as the manufacturer and installer of the asbestos-containing insulation in the boiler room, other evidence was presented that permitted a reasonable judge or factfinder to infer otherwise.

For the reasons explained *supra*, the question of W&G's liability was a close enough question to present to the jury for consideration. A reasonable jury could have inferred that W&G performed the asbestos insulation work in the boiler room at LRHS, the dust from which was a substantial causative factor in Mr. Busch's mesothelioma. Thus, the Buschs shall prevail with their "horseshoes and hand-grenades" body of evidence.

## II.

WGAST's second contention on appeal is that the circuit court erred in informing the jury that McCormick had been dismissed from the lawsuit. As noted earlier, Mr. Busch included McCormick as one of seven original co-defendants to the lawsuit. To set the stage, we shall attempt first to make clear McCormick's involvement in, and ultimate disengagement from, this litigation, and then address WGAST's argument on its merits.

It is not unusual for an asbestos lawsuit to be brought against multiple defendants. As such a case proceeds, and more information is uncovered in the pre-trial stage (and even during trial), it is common for some defendants to be dismissed or otherwise "disappear" from the proceedings before the case is sent to the jury. Additionally, it is not uncommon for co-defendants to file cross-claims against each other.

Here, Mr. Busch brought suit initially against seven entities, including McCormick and WGAST. WGAST asserted cross-claims against McCormick, alleging that McCormick was responsible for insulating the boilers at LRHS using asbestos-containing insulation. Despite this, McCormick was not a party when the case was given to the jury. It had been dismissed from the proceedings, before trial commenced, by the grant of an unopposed summary judgment motion because no party could identify sufficient and competent evidence upon which it could be surmised that McCormick performed any work or supplied any product involving asbestos insulation regarding the LRHS boilers.

At trial, WGAST caused to be admitted into evidence various documents, including Busch's original Complaint, which listed all of the original defendants. WGAST moved successfully into evidence also historical Baltimore City Asbestos Personal Injury Master

- 17 -

Complaints and Amendments by Interlineation, dating from the late 1980s and early 1990s.

These documents included excerpts from:

- Master Complaint from *In Re: Personal Injury Asbestos Cases CT-2 Trades Cases*, dated 10 July 1987;
- Amendment by Interlineation to Master Complaint from *In Re: Personal Injury Asbestos Cases, CT-1 Trades Cases, CT-2 Bethlehem Steel Case, CT-3 Railroad Cases, CT-4 Other Asbestos Cases, and CT-5 Shipyard Cases*, dated 4 April 1989;
- Amended Master Complaint from *In Re: Personal Injury Asbestos Cases, CT-1 Trades Cases*, dated 20 June 1990;
- Amendment by Interlineation to Master Complaint filed in *In Re: Personal Injury Asbestos Cases, CT-1 Trades Cases*, dated 12 November 1990;
- Amendment by Interlineation to Master Complaint from *In Re: Personal Injury Asbestos Cases, CT-1 Cases*, dated 5 February 1991;
- Amendment by Interlineation to Master Complaint filed in *In Re: Personal Injury Asbestos Cases, CT-1 Trades Cases*, dated 27 February 1991; and,
- Amendment by Interlineation to Master Complaint from *In Re: Personal Injury Asbestos Cases, CT-1 Trades Cases*, dated 27 October 1994.

The exhibits introduced by WGAST identified many different entities as defendants. All seven defendants named initially in the Buschs's Complaint were identified, as well as other entities that had gone bankrupt over the past twenty-five years, and all entities believed by the Buschs to be responsible for contributing to the development of Mr. Busch's mesothelioma. In total, there were at least 23 other entities identified in these documents introduced by WGAST that were not defendants being tried in the trial in the present case.

In response to these documentary admissions by WGAST, the Buschs sought to admit the circuit court's order granting summary judgment in favor of McCormick as to all

cross and third-party claims against it by third-party defendants on its unopposed motion, preceded by a stipulation by the Buschs dismissing their claims against McCormick. According to the Buschs, this was necessary because WGAST, in what to them seemed an attempt to muddy the water, had created jury confusion by its use of the Complaint and pleadings in other cases having questionable relevance. The Buschs sought to dispel any confusion by informing the jury simply that McCormick was dismissed by summary judgment and thus was no longer a party in the pending lawsuit. WGAST objected to the Buschs's proposals on various grounds, including relevance.

> After hearing argument, the trial judge concluded:

> But I think it creates an unfair confusion regarding what happened when the defense has it – has entered into the record the fact that these parties [McCormick] were sued, and to not tell the jury that these parties have now been dismissed. I think it creates confusion.
>                                  ***
> [Y]ou've put in the record the complaint identifying McCormick, and now you're saying now in your argument that you [W&G] have a defense of mistaken identity. But you have put in as evidentiary support of that defense the complaint by the plaintiff, and I think that does open up questions for the jury as to what happened to that complaint [as to McCormick].

> At that point, trial counsel for WGAST acquiesced in informing the jury of the

dismissal of McCormick, but not the court's ruling on McCormick's Motion for Summary

Judgment. Counsel stated:

> If you want to tell the jury they're dismissed and they shouldn't consider any reason for it, that's fine.
>                                  ***
> If they want to say it's dismissed to complete the record, that's fine. But I'm objecting to any explanation . . .

The circuit court permitted ultimately the Buschs to inform the jury that McCormick had been dismissed. It did not allow them, however, to make reference to the Buschs's dismissal of their claims against McCormick, McCormick's unopposed motion for summary judgment, or the order granting the motion. The trial judge explained that there was a difference between informing the jury that former parties mentioned by WGAST in its evidentiary submissions were dismissed and informing the jury specifically of the legal vehicle by which its exit from the case was accomplished. Accordingly, the judge ruled:

> But I guess my ruling then is allowing in the fact that these parties were dismissed, are no longer in the case but stripped of any content or context for that dismissal.
>
> Because I believe that the content and the context has the potential for creating unfair prejudice by invoking the Court's reasoning, or if not the Court's reasoning, in the case of a motion for summary judgment, it invites the jury to speculate as to the amount or the reasons why other parties may have settled.
>
> So I want to avoid that, and I think that all parties should take care to avoid that. And that goes to the defense as well. Because I can imagine ways you could craft your closing argument that would invite further inquiry. So I would say all parties should proceed very cautiously to avoid any inferences as to why other parties aren't here.

Consistent with this ruling, counsel for the Buschs informed the jury: "Plaintiffs dismissed any and all claims against [McCormick] in Mr. Busch's case."

**STANDARD OF REVIEW**

We review a trial court's evidentiary determinations generally for an abuse of discretion. *Ruffin Hotel Corp. of Maryland v. Gasper*, 418 Md. 594, 619, 17 A.3d 676, 691 (2011). We give no deference, however, to a trial court's conclusion as to whether evidence is relevant. *State v. Robertson*, No. 40, slip op. at 8 (Md. Apr. 2, 2019); *see also*

- 20 -

*Ford v. State*, 462 Md. 3, 46, 197 A.3d 1090, 1115 (2018), reconsideration denied (Dec. 11, 2018). In regards to application of the "opening the door" doctrine, we evaluate a trial court's decision first, as a matter of law, whether the "door" was opened, and then, for an abuse of discretion as to the trial court's response if the "door" was opened. *Little v. Schneider*, 434 Md. 150, 170, 73 A.3d 1074, 1085 (2013).

## DISCUSSION

WGAST contends that the circuit court's and Court of Special Appeals' "unsubstantiated assumption" that admission of the complaints at trial by WGAST created unfair potential confusion is erroneous. It continues that admitting evidence that McCormick had been sued, but was no longer in the case, was not confusing, so no corrective action was necessary. WGAST argues that the "opening the door" doctrine, relied on by the Court of Special Appeals, was applied in error because: 1) there was no actual or potential problem requiring an evidentiary cure; and, 2) there was no unfair prejudice relating to confusion as to McCormick's status, so no "door" was "opened." We cast a jaundiced eye on WGAST's urgings in this regard.

The "opening the door" doctrine expands relevancy in an attempt to quell confusion regarding previously admitted other evidence. It renders otherwise irrelevant evidence admissible as relevant through an opposing party's prior admission of evidence relating to the same subject matter. As we explained:

> The doctrine of "opening the door" to otherwise inadmissible evidence is based on principles of fairness. As we have stated: "'opening the door' is simply a way of saying: 'My opponent has injected an issue into the case, and I ought to be able to introduce evidence on that issue.'" *Clark v. State*, 332 Md. 77, 85, 629 A.2d 1239, 1243 (1993). It is a method by which we

- 21 -

allow parties to "meet fire with fire," as they introduce otherwise inadmissible evidence in response to evidence put forth by the opposing side. *See Terry v. State*, 332 Md. 329, 337, 631 A.2d 424, 428 (1993). In this regard, the "doctrine is really a rule of expanded relevancy." *Clark*, 332 Md. at 84, 629 A.2d at 1242. It "authorizes admitting evidence which otherwise would have been irrelevant in order to respond to ... admissible evidence which generates an issue." *Id.* at 84-85, 629 A.2d at 1243.

*Little*, 434 Md. at 157, 73 A.3d at 1078 (footnote omitted). Despite the expansion afforded by the doctrine, it has limitations. For example, the "door" must be opened before the otherwise irrelevant evidence is admitted – a party cannot introduce an irrelevant and inadmissible piece of evidence for a controversy not "live" yet. *Clark v. State*, 332 Md. 77, 86–87, 629 A.2d 1239, 1244 (1993). Additionally:

> Such evidence is also subject to exclusion where a court finds that the probative value of the otherwise inadmissible responsive evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

*Id*. at 87, A.2d 1244.

Consideration of the "opening the door" doctrine implicates Md. Rule 5-403, which states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[20] This rule, by its nature, involves balancing the probative value against the danger of unfair prejudice, confusion, and other considerations.

---

[20] Indeed, we have infused the verbatim text from Md. Rule 5-403 in our prior decisions discussing the "opening the door" doctrine.

Based on the record before her, the trial judge considered carefully the evidence introduced by WGAST and any potential confusion which that evidence might invoke. She noted astutely that allowing WGAST to introduce the Complaint and historical Baltimore City Asbestos Personal Injury Master Complaints and Amendments by Interlineation from the late 1980s and early 1990s, with nothing more, invited the jury to speculate regarding why McCormick was no longer a party in the present lawsuit, especially in light of WGAST's introduction of Mr. Busch's, Sheppard's, and Huettel's discovery responses blaming McCormick as the sole entity responsible for installing asbestos-containing insulation in the boiler room of LRHS. McCormick's involvement in the earlier stages of the lawsuit, without more, could have been confusing to a lay juror who may not be familiar with the "ins-and-outs" of litigation, let alone asbestos litigation.

The trial judge was in the best position to observe the presentation of the evidence and how it may have been received by the jury. It was within her discretion to evaluate the evidence and determine whether it may create confusion, which potential consequence required clarification. The circuit court did not abuse its discretion by allowing the Buschs to inform the jury of McCormick's dismissal from this litigation.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

IN THE COURT OF APPEALS
OF MARYLAND

No. 58

SEPTEMBER TERM, 2018

---

WALLACE & GALE ASBESTOS
SETTLEMENT TRUST

v.

WILLIAM EDWARD BUSCH, JR., ET UX.

---

Barbera, C.J.,
*Greene
McDonald
Watts
Hotten
Getty
Harrell, Glenn T., Jr.,
        (Senior Judge, Specially Assigned)

JJ.

---

Dissent by Getty, J.

---

Filed: July 3, 2019

*Greene, J., participated in the hearing of the case, in the conference in regard to its decision and in the adoption of the opinion but he retired from the Court prior to the filing of the opinion.

I respectfully dissent from the Majority's conclusion as to the first issue and would hold that the jury was not entitled to infer that Wallace and Gale (hereinafter "W&G") was the insulator responsible for the asbestos-containing products in the Loch Raven High School (hereinafter "LRHS") boiler room. As appropriately framed by the Court of Special Appeals, "this case is, at its core, is about product identification, and the question before us is whether the evidence presented at trial was sufficient to support an inference that W&G installers installed asbestos-containing magnesia block in the boiler room at LRHS." *Wallace & Gale Asbestos Settlement Tr. v. Busch*, 238 Md. App. 695, 707 (2018). In considering this core issue, however, I depart from the conclusion reached by the Court of Special Appeals and the Majority.[1]

Based on the evidence presented at trial, we know Mr. Busch did not install asbestos-containing products himself. Further, no other pieces of direct evidence were produced linking W&G to any asbestos-containing products in the construction at LRHS, let alone in the boiler room during Mr. Busch's time there. In my view, only impermissible inferences drawn from the circumstantial evidence presented at trial could have possibly supported that W&G was more likely than not responsible for installing the asbestos-containing insulation in the boiler room. The jury's verdict was the product of mere conjecture and speculation.

---

[1] I would not have reached and thus do not comment on the second issue of whether the circuit court erred in informing the jury that McCormick had been dismissed from the lawsuit.

In any asbestos case, a plaintiff must demonstrate that exposure to the Defendant's asbestos-containing product was a substantial causative factor in the development of the plaintiff's injury. *Eagle-Picher Indus. v. Balbos*, 326 Md. 179, 210 (1992). We have previously assessed causation by evidence of a plaintiff's "frequency, proximity, and regularity" to the asbestos-containing product. *Id.* at 210 ("[F]actors to be evaluated include the nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product."). In all cases, the plaintiff must demonstrate that the defendant's asbestos-containing product caused the condition.

This Court has refrained from permitting impermissible inferences amounting to speculation to serve as the basis of a defendant's liability in Maryland's asbestos litigation. Most relevant to this case, we held in *Balbos* that due to "missing links in the chain of causation" there was insufficient evidence to find that a plaintiff was injured by one of the installers at a shipyard. 326 Md. at 213 (1992). In that case, one of the plaintiffs presented two theories of liability against one of the defendants, Porter Hayden Company (hereinafter "Porter"), an installer on the project. *Id.* The plaintiff alleged "that Porter sold to the shipyard Johns-Manville (Manville)[2] asbestos products to which [the plaintiff] was exposed" and/or "that Porter's employees exposed [the plaintiff] to asbestos fibers during installation of products at the Key Highway shipyard." *Id.* The evidence presented supported a finding that Manville products were used in areas of ships where the plaintiff

[2] Johns-Manville "dealt almost exclusively in asbestos products." *Id.* at 204.

2

would have frequently been in contact with them; however, this Court determined that the contact was not enough to hold Porter liable. *Id.* at 214. Instead, the plaintiff had the burden of showing that Porter was the seller of the Manville products or that Porter had used them at the shipyard. *Id.*

This Court determined the plaintiff failed to carry that burden. *Id.* Reviewing the evidence presented at trial, we noted that there were the "unknowns," such as whether and to what extent Manville sold directly to the project, and to what extent independent contractors had introduced the asbestos products. *Id.* at 215. Therefore, "[a]bsent quantification of these relationships, it [was] speculation to assume [the plaintiff's] proximity to Manville asbestos at Key Highway is probably proximity to Porter asbestos." *Id.* at 215. As to their second contention, we held that the plaintiff also failed to meet its evidentiary burden because the fact that the shipyard used "outside installers at Key Highway, one of whom was Porter . . . does not establish that [the plaintiff] was frequently exposed in proximity to Porter-supplied asbestos products." *Id.* at 216.

In our precedent that followed *Balbos* we have continued to require evidence that the defendant was responsible for the asbestos-containing product at issue. *See Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 505 (2011) ("In addition to satisfying *Balbos*, a plaintiff must link the defendant to the product."); *Reiter v. Pneumo Abex, LLC*, 417 Md. 57, 69 (2010) ("The case at bar is a 'circumstantial evidence' case in which the Petitioners were required to present evidence of exposure to a '*specific product [made or manufactured by the Respondents]* on a regular basis, over some extended period of time,

3

in proximity to where the [decedents] actually worked.'" (emphasis added) (citing *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162-63 (4th Cir. 1986)).  Here, I believe the Majority is departing from our long-held standard.  The Majority is permitting the baseline requirement that Mr. Busch must link W&G to the asbestos insulation to be satisfied through impermissible inferences when we have no evidence that W&G utilized *any* asbestos containing products at LRHS, much less the boiler room, during the time Mr. Busch worked there.

In review of the evidence before the jury, W&G had a broad contractual undertaking for "insulat[ing] various plumbing, heating and ventilating surfaces" at LRHS and spent many hours working at LRHS.  As to the boiler room specifically, the evidence showed only that W&G performed insulation work on the fire lines inside the boiler room, with insulation free of asbestos.

In his pre-trial interrogatory answers, Mr. Busch declared that McCormick was the contractor responsible for installing the asbestos-containing insulation in the LRHS boiler room.  Specifically, Mr. Busch stated that he "worked with and around asbestos-containing thermal insulation products sold, supplied, and installed by McCormick."  At trial, Mr. Busch never renounced his assertion but instead stated that he now suffered memory loss.  On the record, he acknowledged his answers to the interrogatories and that he had not attempted to repudiate or correct them before trial.  The entirety of his testimony was that, despite his previous statements, he no longer recalled who performed the asbestos-containing insulation work in the boiler room at LRHS.

Mr. Huettel and Mr. Sheppard, co-workers of Mr. Busch, affirmed in their deposition, read into evidence at trial, that McCormick was the contractor responsible for installing the asbestos-containing insulation. When Mr. Huettel was asked at his deposition if he recalled which company hired the pipe coverers at LRHS, he responded: "[t]hat was McCormick." When asked if he could identify what the pipe coverers did at LRHS, he responded, "[w]ell, they insulated the boilers." Likewise, Mr. Sheppard identified McCormick as the installer of the asbestos-containing materials in the boiler room. He recounted specifically McCormick's name as printed on the workers' toolboxes and on the asbestos insulation packaging with "made by McCormick" labels.

W&G produced invoices and other statements regarding its work at LRHS. Every document produced embracing the time in which Mr. Busch performed work at LRHS referred to specific materials such as foamglass, fiberglass, or "power house cement." It is uncontroverted that those products did not contain asbestos.

W&G also produced timesheets that identify when W&G employees worked in LRHS generally and for how long. However, they do not reveal specifically what work was performed nor where in LRHS the work was performed except for the fire lines in the boiler room. At best, the timesheets demonstrate that W&G was present somewhere in LRHS for relatively substantial periods of time. Construction in the high school spanned several months commencing in 1971 and ending in 1972. A claim that the timesheets give rise to an inference that W&G performed insulation work using asbestos-containing materials in the boiler room is a bridge too far.

5

By contrast, Mr. Busch produced no evidence showing that W&G supplied or installed asbestos-containing materials anywhere in LRHS during the time Mr. Busch performed work there. It is unreasonable to draw from the more generalized evidence of W&G's other work at LRHS an inference that it likely installed the asbestos insulation in the boiler room. Not one piece of evidence placed Mr. Busch in the same location or vicinity, at the same time, where W&G used an asbestos-containing product at LRHS. For that matter, there was no evidence presented that demonstrated W&G's installation of asbestos-containing materials *anywhere* in LRHS during the time Mr. Busch performed work there. In light of the dearth of such evidence, the jury's verdict amounted to impermissible speculation.

I agree with the Majority that in asbestos cases, circumstantial evidence (and reasonable inferences available therefrom) can be sufficient to establish exposure or liability. *Slip op.* at 15. However, in my view, based on the evidence presented here, the jury was not entitled to infer that W&G was the insulator responsible for the asbestos-containing products in the LRHS boiler room. It is well established that a case resting on speculation, conjecture, or surmise is not sufficient to submit to a jury. *See Baulsir v. Sugar*, 266 Md. 390, 395 (1972) ("[A] plaintiff has not met his burden of proof if he presents merely a scintilla of evidence where the jury must resort to surmise and conjecture to declare his right to recover. A hypothesis resting on surmise and conjecture is not enough to warrant a submission of the case to the jury." (internal citations omitted)); *see also Peterson v. Underwood*, 258 Md. 9, 21 (1970) (reversing the Court of Special

6

Appeals' judgment due to lack of proof of liability because allowing a jury "to attempt to answer the question . . . without any evidence as a guide would permit 'the rankest kind of guesswork, speculation and conjecture.'").

A defendant's primary or general presence at a large worksite, without more, fails to demonstrate the required degree of specificity required by Maryland's asbestos liability jurisprudence in order to hold this Defendant responsible for Mr. Busch's asbestos exposure in the LRHS boiler room. It follows that it does not constitute sufficient proof of product identification, thus preventing W&G[3] from being held liable.

The inference that W&G was more likely than not responsible for the asbestos work in the boiler room was an assumption based on asserted probability created by W&G's mere presence at LRHS. A missing (and determinative) piece of the mosaic constructed by Busch is evidence linking W&G to the installation of the asbestos-containing materials used in the boiler room, or even linking W&G to asbestos work performed anywhere in LRHS. Therefore, I would have reversed the Court of Special Appeals.

---

[3] Technically speaking, Wallace & Gale Asbestos Settlement Trust is the party from which Mr. Busch would recover.